[No. S098928. June 28, 2004.]

In re LEON CASEY ALVA on Habeas Corpus.

**COUNSEL**

Steven T. Flowers for Petitioner.

James K. Hahn and Rockard J. Delgadillo, City Attorneys, Debbie Lew, Assistant City Attorney, and Candice I. Horikawa, Deputy City Attorney, for Respondent the People.

**OPINION**

**BAXTER, J.**—In *In re Reed* (1983) 33 Cal.3d 914 [191 Cal.Rptr. 658, 663 P.2d 216] (*Reed*), this court held that California's law requiring lifelong registration as a convicted sex offender (see Pen. Code, § 290 et seq.)[1] violated the "cruel or unusual punishment" clause of the California Constitution (art. I, § 17) as applied to one convicted of the misdemeanor of engaging in, or soliciting, lewd or dissolute conduct in a public place (§ 647, subd. (a) (§ 647(a)). Here, petitioner Leon Casey Alva was convicted of another sex-related misdemeanor, possession of child pornography, as a first offense. (§ 311.11, subd. (a).) He urges that mandatory lifetime sex offender registration for this crime similarly constitutes cruel and/or unusual punishment under both the state and federal Constitutions. We disagree. Indeed, developments since *Reed* persuade us that *Reed* itself was incorrectly decided and must be overruled.

A necessary predicate to *Reed*'s holding was its conclusion that sex registration constitutes "punishment" within the meaning of California's cruel or unusual punishment clause. The *Reed* majority conceded that "the Legislature may reasonably have intended . . . sex offender registration [to] serve as

---

[1] All further unlabeled statutory references are to the Penal Code.

a law enforcement tool to facilitate criminal investigations." (*Reed, supra*, 33 Cal.3d 914, 922.) Nonetheless, after purporting to apply the multifactor test set forth in *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144 [9 L.Ed.2d 644, 83 S.Ct. 554] (*Mendoza-Martinez*), the *Reed* majority determined that sex registration was punitive.

More recently, however, this court held in *People v. Castellanos* (1999) 21 Cal.4th 785 [88 Cal.Rptr.2d 346, 982 P.2d 211] (*Castellanos*) that sex offender registration is regulatory in both purpose and effect, and is thus not "punishment" for purposes of the state and federal ex post facto clauses (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9). Both the lead and concurring opinions in *Castellanos* concluded that *Reed*'s application of the *Mendoza-Martinez* test was not persuasive for ex post facto purposes.

Nonetheless, *Castellanos* reserved the question whether *Reed* remained good law in the context of cruel and/or unusual punishment. Our concern on this account stemmed solely from a single high court decision, *Austin v. United States* (1993) 509 U.S. 602 [125 L.Ed.2d 488, 113 S.Ct. 2801] (*Austin*). *Austin* suggested, in a context far removed from sex offender registration laws, that a measure might impose "punishment" for purposes of the Eighth Amendment's ban on cruel and unusual punishment even if it was not punitive for other constitutional purposes under the *Mendoza-Martinez* test.

More recently still, the United States Supreme Court, placing extensive reliance on the *Mendoza-Martinez* test, has confirmed that Alaska's sex offender registration act—and in particular, the statute's provision for *notification to the public* about the registrant's identity, crime, and whereabouts—is a regulatory law, not a punitive measure, for purposes of the federal ex post facto clause. (*Smith v. Doe* (2003) 538 U.S. 84 [155 L.Ed.2d 164, 123 S.Ct. 1140] (*Smith*).)

When *Reed* was decided, only five states, including California, "require[d] any kind of sex offender registration." (*Reed, supra*, 33 Cal.3d 914, 925.) Since that time, virtually every one of the United States has enacted such a law. Many were prompted by congressional legislation, adopted in the 1990's, which conditions certain federal grants-in-aid on a state's enactment of conforming sex offender registration laws. Almost without exception, the state and federal courts considering these state laws have found—both before and since *Austin*—that they are legitimate regulatory measures, designed to assist law enforcement and to protect the public, and are not punitive for purposes of constitutional proscriptions against cruel and/or unusual punishment.

We now do the same. Even if *Austin, supra,* 509 U.S. 602, establishes a stricter test of "punishment" for Eighth Amendment purposes than might apply under other provisions of the federal Constitution, we conclude that California's law requiring the mere *registration* of convicted sex offenders is not a punitive measure subject to either state or federal proscriptions against punishment that is "cruel" and/or "unusual."

In the case before us, the Court of Appeal affirmed the registration requirement against Alva. Under compulsion of *Reed, supra,* 33 Cal.3d 914, the Court of Appeal assumed that a sex offender registration requirement is punishment for purposes of our state's prohibition of cruel or unusual punishment. However, the court found that requiring Alva to register as a sex offender is neither "cruel" nor "unusual" as applied to the facts surrounding his offense. Because we now conclude, contrary to *Reed,* that the registration requirement is not punishment at all for this purpose, we will affirm the judgment of the Court of Appeal.

## FACTS AND PROCEDURAL BACKGROUND

■ After a 1999 municipal court trial, Alva was convicted of a misdemeanor count of possession of child pornography, a violation of section 311.11, subdivision (a). This statute makes it a public offense for any person, among other things, to possess or control any visual matter, "the production of which involve[d] the use of a person under the age of 18 years, knowing that the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct."[2] In other words, the prohibited matter must depict actual persons, who are actually under 18, engaged in actual or simulated sex acts, and the violator must know that this is so. Only the first violation of section 311.11, subdivision (a) is a misdemeanor; subsequent violations are felonies. (§ 311.11, subd. (b).)

At a sentencing hearing on July 13, 1999, the court placed Alva on 36 months' summary probation, with the conditions, among others, that he serve 60 days in jail (stayed pending completion of probation), pay fines totaling $1,550, and complete sexual deviancy therapy. As required by section 290,

---

[2] Section 311.11, subdivision (a) incorporates by reference the definition of "sexual conduct" set forth in section 311.4, subdivision (d)(1), which defines "sexual conduct" to include "any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer, any lewd or lascivious sexual act as defined in Section 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals."

subdivision (a)(2)(A), the court also imposed a lifetime obligation that Alva register as a sex offender under subdivision (a)(1) of section 290.

Alva's appeal argued, among other things, that the sex offender registration requirement was cruel and/or unusual punishment as applied to the facts of his case. The appellate division of the superior court affirmed the judgment. Alva's motion for rehearing, or in the alternative for certification to the Court of Appeal (see Cal. Rules of Court, former rule 63), was denied, and the appellate division issued its remittitur.

Thereafter, Alva filed an original petition for writ of habeas corpus in the Court of Appeal, re-raising all the issues rejected in his appeal. The petition was summarily denied. We granted review and retransferred the matter to the Court of Appeal, Second Appellate District, Division Three, with instructions to order the Los Angeles County Probation Department to show cause before the Court of Appeal "why the requirement that [Alva] register as a sex offender is not cruel and/or unusual punishment under the United States and California Constitutions. (See U.S. Const., 8th Amend.; Cal. Const., art. I, § 17; Pen. Code, §§ 311.11, 290[,] [subdivision] (a)(2)(A); *People v. Castellanos* (1999) 21 Cal.4th 785 [88 Cal.Rptr.2d 346, 982 P.2d 211]; *In re Reed* (1983) 33 Cal.3d 914 [191 Cal.Rptr. 658, 663 P.2d 216].)"

The Court of Appeal denied habeas corpus relief and discharged the order to show cause. First, the Court of Appeal agreed with the vast majority of non-California decisions that sex offender registration is not "punishment" for purposes of the Eighth Amendment's proscription of "cruel and unusual punishments." Second, though it questioned the continued viability of *Reed, supra,* 33 Cal.3d 914, in light of *Castellanos, supra,* 21 Cal.4th 785, the court concluded *Castellanos* had not overruled *Reed*'s determination that sex offender registration is "punishment" for purposes of the California Constitution's ban on "cruel or unusual punishment." (Cal. Const., art. I, § 17.) Third, in an extensive analysis, the court determined that sex offender registration, even if "punishment," is not "cruel or unusual" as applied either to the statutory offense of possession of child pornography or to the particular facts of Alva's case.

Both parties sought review. Alva urged that there was no evidence he is an actual threat to children, and that the "punishment" of sex offender registration is cruel and/or unusual in his case. Respondent argued that sex offender registration is not "punishment" at all within the scope of constitutional protections against punishments that are "cruel" and/or "unusual."[3] Noting

---

[3] When we earlier granted and retransferred this matter, we instructed that the Court of Appeal's order to show cause be directed to the *county's* probation department. The Court of Appeal followed this instruction. However, Alva's counsel also served the order to show cause

such intervening developments as our decision in *Castellanos, supra*, 21 Cal.4th 785, respondent urged that we reexamine *Reed, supra*, 33 Cal.3d 914, in this context.

We granted respondent's petition, but denied Alva's. We now agree with the Court of Appeal that for purposes of the Eighth Amendment, sex offender registration is a legitimate regulatory measure, not punishment, and thus falls outside the scope of the United States Constitution's ban on cruel and unusual punishments. For similar reasons, and after careful reflection, we further conclude that *Reed, supra*, 33 Cal.3d 914, erred in holding that sex offender registration constitutes "punishment" for purposes of the California Constitution's "cruel or unusual punishment" clause. We will therefore overrule *Reed*.

## DISCUSSION

California has had some form of sex offender registration requirement since 1947. (See former § 290, as enacted by Stats. 1947, ch. 1124, § 1, p. 2562.) "As this court has consistently reiterated: 'The purpose of section 290 is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future. [Citation.]' [Citations.] . . . [¶] . . . The statute is thus regulatory in nature, intended to accomplish the government's objective by mandating certain affirmative acts." (*Wright v. Superior Court* (1997) 15 Cal.4th 521, 527 [63 Cal.Rptr.2d 322, 936 P.2d 101] (*Wright*); see *Castellanos, supra*, 21 Cal.4th 785, 796 (lead opn. of George, C. J.); *Reed, supra*, 33 Cal.3d 914, 919; *In re Smith* (1972) 7 Cal.3d 362, 367 [102 Cal.Rptr. 335, 497 P.2d 807]; *Barrows v. Municipal Court* (1970) 1 Cal.3d 821, 825–826 [83 Cal.Rptr. 819, 464 P.2d 483]; see also *People v. Ansell* (2001) 25 Cal.4th 868, 886 [108 Cal.Rptr.2d 145, 24 P.3d 1174] (*Ansell*).)

Now, as when Alva was convicted, subdivision (a)(1) of section 290 provides that every person convicted of an offense enumerated in subdivision (a)(2)(A)—including, since 1994, a violation of section 311.11, subdivision (a)—must register for life, so long as he or she lives, works, or studies in California, with the police chief of each city or town or the county sheriff of each unincorporated area, and the police chief of any public university or

upon the Los Angeles *City* Attorney, the prosecutor in Alva's criminal case, explaining that Alva, though then still on probation, was technically in the "custody," not of the probation department, but of the superior court. Thereafter, briefing both in the Court of Appeal and in this court has been filed on behalf of "the People," as "real party in interest," by the city attorney. We later referred to "the People" in an order, dated October 29, 2003, in which we solicited supplemental briefing from Alva. To avoid confusion hereafter, we refer to the governmental interest opposing the petition simply as "respondent."

college campus, where he or she resides or is located.[4] The registrant must provide, inter alia, his or her current residence and employment addresses, fingerprints and a current photograph, and the license plate number of every vehicle he or she owns or regularly drives, and related information as required by the California Department of Justice (Department). (§ 290, subds. (a)(1)(A)–(D), (e)(2)(A)–(C).) The offender must register anew within five working days of changing his residence or location (*id.*, subd. (a)(1)(A)), and must update his registration within five working days after each birthday (*id.*, subd. (a)(1)(D)). One who violates a registration requirement that is based on a misdemeanor conviction is guilty of a misdemeanor (*id.*, subd. (g)(1)), and a "willful[]" violation is a continuing offense (*id.*, subd. (g)(8)).[5]

■ The registration materials are forwarded to the Department. (§ 290, subd. (e)(3).) Except with respect to section 290.4(a)(1) registrants (see fn. 4, *ante*), "the statements, photographs, and fingerprints required by . . . section [290] shall not be open to inspection by the public or by any person other than a regularly employed peace officer or other law enforcement officer." (§ 290, subd. (i).) Alva is not a section 290.4(a)(1) registrant, because a conviction for possession of child pornography in violation of section 311.11, subdivision (a)—on which Alva's registration obligation is founded—is not among those offenses enumerated in section 290.4, subdivision (a)(1).[6]

---

[4] As we explained in *Ansell, supra,* 25 Cal.4th 868, the registration obligation, though otherwise lifelong, is terminated for many covered offenses, including Alva's, if the registrants obtain certificates of rehabilitation (certificates) from the superior court under section 4852.01 et seq. (*Ansell, supra,* at p. 877 & fn. 17; see § 290.5, subd. (a).) Under a 1997 amendment to section 4852.01 (Stats. 1997, ch. 61, § 2), those convicted of certain sex offenses against children (not including Alva's) are ineligible for certificates. (§ 4852.01, subd. (d).) Moreover, even if they may and do obtain certificates, persons (not including Alva; see discussion, *post*) whose registration duties stem from convictions of the offenses listed in subdivision (a)(1) of section 290.4 (hereafter section 290.4(a)(1) registrants) are not, except in specified circumstances, thereby relieved of their registration obligations, but they are so relieved upon receiving full pardons from the Governor (§ 290.5, subd. (b)). (*Ansell, supra,* at p. 877, fn. 16.) These provisions are consistent with the regulatory purpose to monitor convicted sex offenders, who are generally considered susceptible to recidivism, but to end such special monitoring of those who have demonstrated that their likelihood of reoffense is low.

[5] Similar registration requirements are imposed, under other statutes, upon persons convicted of certain drug offenses (Health & Saf. Code, § 11590 et seq.), arson (Pen. Code, § 457.1), and gang-related crimes (*id.*, § 186.30 et seq.). These statutes, like section 290 as applicable to sex offenders, are concerned with assisting law enforcement to prevent and detect repeat crimes of kinds deemed highly susceptible to recidivism. (*In re Luisa Z.* (2000) 78 Cal.App.4th 978, 982–983 [93 Cal.Rptr.2d 231] [narcotics offender registration]; *People v. Adams* (1990) 224 Cal.App.3d 705, 710 [274 Cal.Rptr. 94][compulsive arsonist registration].)

[6] Under section 290.4, the Department must maintain a "900" telephone number, which members of the public may call to confirm that a specific person is a section 290.4(a)(1) registrant (*id.*, subd. (a)(3)), and must also supply, to county sheriffs, and to the police departments of populous cities, CD-ROM's or other electronic media containing a list of such registrants' names, which members of the public may view under specified circumstances (*id.*,

The Eighth Amendment to the United States Constitution provides, in pertinent part, that "cruel and unusual punishments [shall not be] inflicted." The parallel provision of the California Constitution declares that "[c]ruel or unusual punishment may not be inflicted." (Cal. Const., art. I, § 17.) Though many state and federal courts have spoken on the subject (see discussion *post*), neither we nor the United States Supreme Court has considered the validity of a sex offender registration requirement under the federal proscription of cruel and unusual punishments.

Two decades ago, however, when sex offender registration statutes were rare, this court addressed the state constitutional implications of such a scheme in *Reed, supra,* 33 Cal.3d 914. There a majority concluded that the state Constitution's guarantee against "cruel or unusual punishment" precluded application of section 290 to the misdemeanor offense of engaging in, or soliciting, lewd or dissolute conduct in a public place (§ 647(a)).

This holding required a preliminary determination whether sex offender registration was a form of "punishment" subject to the state constitutional guarantee against punishments that are "cruel or unusual." To resolve that issue, the *Reed* majority purported to apply the multifactor test of "punishment" enunciated by the United States Supreme Court in *Mendoza-Martinez, supra,* 372 U.S. 144.[7]

*Mendoza-Martinez* suggested that a statute's intent to impose punishment may appear on its face, or from its legislative history. (*Mendoza-Martinez, supra,* 372 U.S. 144, 169.) However, *Mendoza-Martinez* indicated, a measure's punitive nature may also be discerned by weighing such factors as

---

subd. (a)(4)). Section 290.45 further authorizes a law enforcement agency, when it reasonably suspects that a child or other member of the public may be at risk from a section 290.4(a)(1) registrant, to disclose more complete information about the registrant and his prior offense or offenses to persons, agencies, or organizations the registrant is likely to encounter, and, in limited circumstances, to authorize such persons, agencies, or organizations to disclose this information to additional persons. (§ 290.45, subd. (a).) Section 290.45 also permits designated law enforcement agencies to advise the public generally of the presence in its community of certain section 290.4(a)(1) registrants who meet the statutory criteria for "high-risk sex offenders." (§ 290.45, subd. (b).) Again, because Alva is not a section 290.4(a)(1) registrant, these public inspection and public notification provisions do not apply to him.

[7] The issue in *Mendoza-Martinez* was whether a law imposing automatic forfeiture of citizenship upon one who left or remained outside the country in order to avoid military service during a war or national emergency was "essentially penal in character," and thus invalid for failure to afford due process of law and the procedural rights guaranteed in criminal cases by the Fifth and Sixth Amendments to the federal Constitution. (*Mendoza-Martinez, supra,* 372 U.S. 144, 146, 164 [9 L.Ed.2d 644].) As is explained in greater detail below, the *Mendoza-Martinez* factors have subsequently also been applied to distinguish punitive measures from those that are merely regulatory for purposes of other federal constitutional provisions, including the ex post facto and double jeopardy clauses of the federal Constitution.

"[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned." (*Id.* at pp. 168–169, fns. omitted.)

Assessing the sex offender registration requirement in light of these factors, the *Reed* majority concluded that registration is punishment. The majority conceded that "the Legislature may reasonably have intended . . . sex offender registration [to] serve as a law enforcement tool to facilitate criminal investigations" (*Reed, supra*, 33 Cal.3d 914, 922), and that registration of sex offenders has not historically been viewed as punishment (*id.* at p. 921), but concluded that these considerations were not dispositive.

Instead, the *Reed* majority stressed its view that registration imposes an affirmative disability or restraint. Registration is punitive in its essential nature, the majority asserted, because, aside from the lifelong duties and obligations involved, it produces a stigma—an " 'ignominious badge' "—that may remain with the registrant forever, and also exposes the registrant to police compulsion in the form of " 'command performance[]' " appearances in lineups. (*Reed, supra*, 33 Cal.3d 914, 920, italics omitted.)

Moreover, the *Reed* majority reasoned, "[t]he third, fourth, and fifth factors enumerated in *Mendoza-Martinez* are readily satisfied," at least when registration is imposed for the crime of public lewdness. (*Reed, supra*, 33 Cal.3d 914, 921–922.) That offense, the majority observed, requires lewd intent, and a resulting registration requirement thus comes into play only upon a finding of scienter. Moreover, said the majority, "the legislative intent was surely to deter recidivism by facilitating the apprehension of past offenders. [Citation.] And, of course, 'the conduct to which [registration] . . . applies is already a crime.' " (*Id.* at p. 922.)

Finally, the *Reed* majority was unpersuaded that registration was justified, despite its punitive incidents, by an alternative, nonpunitive purpose. First, the majority in *Reed* doubted that registration of sex offenders is, in fact, an effective law enforcement tool. In any event, the majority concluded, "the fact that a minimal or 'rational' basis may underlie the legislation is outweighed here by the fact that the penalty of registration is '*excessive* in

relation to the alternative purpose assigned' to it. [Citation.]" (*Reed, supra*, 33 Cal.3d 914, 922, italics added by *Reed*.)[8]

■    Developments since *Reed* persuade us that this analysis is no longer viable. We now conclude that a requirement of mere *registration* by one convicted of a sex-related crime, despite the inconvenience it imposes, cannot be considered a form of "punishment" regulated by either federal or state constitutional proscriptions against cruel and/or unusual punishment.[9]

Courts have had difficulty deciding how to determine when legislation imposes "punishment" for purposes of the several constitutional provisions to which that concept is relevant. But, with one exception discussed below, we and the United States Supreme Court have moved steadily away from the *Reed* perspective, both in general and with respect to sex offender registration statutes in particular. The factors set forth in *Mendoza-Martinez, supra*, 372 U.S. 144, remain relevant in a number of these constitutional contexts, but the ways in which they are applied are distinctly at odds with *Reed*'s treatment.

Thus, in *People v. McVickers* (1992) 4 Cal.4th 81 [13 Cal.Rptr.2d 850, 840 P.2d 955] (*McVickers*), we considered whether a statute requiring persons convicted of certain sex crimes to submit to blood tests for AIDS violated the state and federal ex post facto clauses, as applied to persons who had committed their crimes before the testing requirement was adopted. At issue was whether the statute had improperly increased the "punishment" for such crimes after their commission (see *Collins v. Youngblood* (1990) 497 U.S. 37, 42 [111 L.Ed.2d 30, 110 S.Ct. 2715]) by means of "retrospective legislation with a punitive effect or purpose." (*McVickers, supra*, at p. 85.)

For the proper test of punishment, we looked at the outset not only to *Mendoza-Martinez, supra*, 372 U.S. 144, but to the plurality opinion in *Trop v. Dulles* (1958) 356 U.S. 86 [2 L.Ed.2d 630, 78 S.Ct. 590] (*Trop*). We noted the *Trop* plurality's statement that " '[i]n deciding whether or not a law

---

[8] After *Reed, supra*, 33 Cal.3d 914, concluded that registration was "cruel or unusual punishment" for one convicted of public lewd solicitation under section 647(a), the Legislature amended section 290 to delete the registration requirement for persons convicted of that offense. (Stats. 1985, ch. 929, § 4, p. 2936; *id.*, ch. 1474, § 1, p. 5403.)

[9] For purposes of this case, we consider only the *registration* provisions of the California scheme. As indicated above, though California's sex offender registration law currently contains some provisions for *public disclosure* of registration information, Alva does not come within these provisions, because his registration requirement is not based on conviction of one of the specific offenses to which they apply. Hence, though such public-disclosure provisions have generally been upheld against constitutional challenge as legitimate means of assisting the public to protect itself against dangerous recidivist sex offenders, we need not and do not consider how our analysis might be affected if such provisions applied to this case.

is penal, this Court has generally based its determination upon the purpose of the statute. . . . [A] statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.' [Fns. omitted]." (*McVickers, supra,* 4 Cal.4th 81, 85, quoting *Trop, supra,* at p. 96 (opn. of Warren, C. J.).) *Trop,* discussed in greater detail below, is significant because it is one of the relatively few high court cases addressing what constitutes punishment *for purposes of the Eighth Amendment's prohibition of "cruel and unusual punishments."*

Examining these factors, we reasoned that blood testing produces only slight intrusion, inconvenience, risk, and discomfort, not rising in its nature to the level of punishment. Further, we observed, the statute's strictly limited disclosure provisions were not "punishment" in the form of ostracism, for unless the defendant offended again, the test results were disclosed only to the defendant, his attorney, and the Department (for use by the prosecution, if the test results were positive, to enhance punishment for a future offense). (*McVickers, supra,* 4 Cal.4th 81, 88.) We stressed that the statute had a legitimate nonpunitive purpose—preventing the spread of AIDS—and that its provisions were not excessive in relation to its goal. (*Id.* at pp. 88–89.)

Thereafter, in *Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*), the United States Supreme Court addressed double jeopardy and ex post facto challenges to Kansas's Sexually Violent Predators Act (Kansas Act), which provided for the involuntary confinement and treatment, beyond their prison terms, of certain dangerously disordered recidivist sex offenders. Both the ex post facto and double jeopardy arguments against the Kansas Act stemmed from the premise that the statute, despite its "civil" label, imposed new "punishment" for prior crimes.

In rejecting the claim of "punishment," the *Hendricks* majority addressed factors similar to those discussed in *Mendoza-Martinez, supra,* 372 U.S. 144. (See *Hendricks, supra,* 521 U.S. 346, 362–364.) In particular, the majority stressed that all presumptions favored the Kansas Legislature's facial designation of the proceedings as "civil," not "criminal" and punitive. "Although we recognize that a 'civil label is not always dispositive,' [citation]," the majority observed, "we will reject the legislature's manifest intent only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " (*Id.* at p. 361, quoting *United States v. Ward* (1980) 448 U.S. 242, 248–249 [65 L.Ed.2d 742, 100 S.Ct. 2636] (*Ward*); see also *Seling v. Young* (2001) 531 U.S. 250, 261 [148 L.Ed.2d 734, 121 S.Ct. 727].)

In *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*), we adhered closely to *Hendricks, supra,* 521 U.S.

346, in concluding that California's Sexually Violent Predators Act, a statute similar to the Kansas Act, does not impose punishment for purposes of the state and federal ex post facto clauses. (*Hubbart, supra,* at pp. 1170–1179.)

The same year we decided *Hubbart, supra,* 19 Cal.4th 1138, we directly addressed whether mandatory sex offender registration, as provided by section 290, constitutes "punishment." In *Castellanos, supra,* 21 Cal.4th 785, 88 Cal.Rptr.2d 346, 982 P.2d 211, we rejected the defendant's claim that state and federal guaranties against ex post facto legislation immunized him from registration under a provision of section 290 which became effective only after he committed his offense.[10] All but one member of this court agreed that ex post facto principles were not implicated by application of the new registration provision to Castellanos's earlier offense, because registration was not new or increased "punishment" for that crime.

The lead opinion in *Castellanos, supra,* 21 Cal.4th 785, first extensively reviewed the United States Supreme Court's post-*Reed* punishment jurisprudence. The opinion noted that the high court's modern decisions had analyzed the concept of punishment somewhat differently in various constitutional contexts. In these circumstances, the opinion expressed uncertainty whether the multifactor test of *Mendoza-Martinez, supra,* 372 U.S. 144, was precisely applicable to the ex post facto clauses. (*Castellanos, supra,* 21 Cal.4th 785, 792–795 & fn. 5 (lead opn. of George, C. J.).) However, the opinion concluded that "two factors appear important in each case: whether the Legislature *intended* the provision to constitute punishment and, if not, whether the provision is [nonetheless] *so punitive in nature or effect* that it must be found to constitute punishment despite the Legislature's contrary intent." (*Id.* at p. 795, fn. omitted, italics added.)

Moreover, the *Castellanos* lead opinion noted, we had applied a similar standard of punishment for ex post facto purposes. Thus, in *McVickers, supra,* 4 Cal.4th 81, we stressed that the AIDS testing requirement there under review, though it imposed a burden, " '[had] a legitimate purpose other than

---

[10] Defendant Castellanos was convicted of multiple counts of burglary and receiving stolen property for crimes committed in 1993 and 1994. He burglarized the homes of teenaged girls whose names he had compiled on a list. He always stole a pair of the girl's panties. Often, he carried away photographs of the girls, and samples of some of the girls' pubic hairs, stored in plastic bags marked with their names, were found at his home. At the time Castellanos committed these crimes, section 290 did not include burglary and receiving stolen property among the enumerated crimes subject to the statute's registration requirements. Thereafter, but before Castellanos's trial, section 290 was amended to require registration, when ordered by the court, upon conviction of "any offense . . . if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification." (§ 290, subd. (a)(2)(E), as added by Stats. 1994, ch. 867, § 2.7, p. 4390.) The trial court found that Castellanos's crimes were sex related.

punishment,' " and that the burden imposed " '[was] not excessive in relation to the statute's stated purpose.' " (*Castellanos, supra,* 21 Cal.4th 785, 796 (lead opn. of George, C. J.), quoting *McVickers, supra,* at p. 89.)

Similarly here, the *Castellanos* lead opinion reasoned whether the burden of sex offender registration is punitive depends on its purpose and effect. (*Castellanos, supra,* 21 Cal.4th 785, 796 (lead opn. of George, C. J.).) That purpose, the opinion confirmed, is " 'to promote the " 'state interest in controlling crime and preventing recidivism in sex offenders.' " [Citation.] As this court consistently has reiterated: "The purpose of section 290 is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future. [Citation.]" [Citations.] . . . [¶] . . . The statute is thus regulatory in nature, intended to accomplish the government's objective by mandating certain affirmative acts.' " (*Castellanos, supra,* at p. 796, quoting *Wright, supra,* 15 Cal.4th 521, 527.)

Accordingly, the *Castellanos* lead opinion determined, "[t]he sex offender registration requirement serves an important and proper remedial purpose, and it does not appear that the Legislature intended the . . . requirement to constitute punishment. Nor is the . . . requirement so punitive in fact that it must be regarded as punishment, despite the Legislature's contrary intent. Although registration imposes a substantial burden on the convicted offender, this burden is no more onerous than necessary to achieve the purpose of the statute." (*Castellanos, supra,* 21 Cal.4th 785, 796, fn. omitted (lead opn. of George, C. J.).) Thus, the opinion concluded, "the sex offender registration requirement imposed by section 290 does not constitute punishment for purposes of ex post facto analysis." (*Id.* at p. 796.)

The *Castellanos* lead opinion acknowledged *Reed*'s conclusion that mandatory sex offender registration was punitive. However, the opinion noted, the United States Supreme Court had since "elaborated upon and refined the criteria to be considered in determining whether a provision should be considered 'punishment' for purposes of ex post facto analysis [citation]" (*Castellanos, supra,* 21 Cal.4th 785, 797 (lead opn. of George, C. J.)), and we had also spoken on the subject. "Upon reexamination of . . . *Reed* in light of these more recent cases," the opinion concluded, "*Reed* should be disapproved to the extent that decision can be interpreted as suggesting that sex offender registration constitutes punishment for purposes of ex post facto analysis." (*Castellanos, supra,* at p. 798.)

In this regard, the *Castellanos* lead opinion concluded we should emphasize, more than *Reed* had done, the regulatory nature of the registration statute, and—considering the virtually unanimous out-of-state authority sustaining registration requirements against ex post facto challenges—the fact

that registration was not historically regarded as punishment. Moreover, the opinion suggested, because *Reed* involved whether registration was "cruel or unusual punishment" for a misdemeanor conviction of lewd solicitation, much of *Reed*'s analysis focused on evidence, presented in that case, that registration was an ineffective enforcement tool and an excessive disability, as applied to that relatively minor crime. Similar considerations are irrelevant to ex post facto analysis, the *Castellanos* lead opinion asserted, which is concerned with whether the disability imposed is excessive in relation to its *regulatory purpose.* (*Castellanos*, *supra*, 21 Cal.4th 785, 798 (lead opn. of George, C. J.).)

The concurring opinion in *Castellanos*, *supra*, 21 Cal.4th 785, reached similar conclusions by a slightly different route. The concurring opinion reasoned as follows: To decide whether a government sanction is punishment for ex post facto or double jeopardy purposes, the court must first determine whether the Legislature intended the sanction to be "civil" or "criminal." The civil or criminal nature of the proceedings in which the sanction is imposed is a powerful, but not dispositive, indicator of the Legislature's intent. If the legislative intent is civil, the court must decide whether the sanction's purpose or effect is nonetheless so punitive that it must be considered punishment. At this second stage, the factors set forth in *Mendoza-Martinez*, *supra*, 372 U.S. 144, provide useful guidance. (*Castellanos*, *supra*, 21 Cal.4th 785, 801–802 (conc. opn. of Kennard, J.).)

Applying these standards, the *Castellanos* concurring opinion determined first that the Legislature had not, in this instance, demonstrated a penal intent by making the registration sanction part of a criminal proceeding. Instead, Justice Kennard reasoned, it was simply more efficient to combine the criminal and registration proceedings, since the latter depended directly on the determinations made in the former. (Comparing *McVickers*, *supra*, 4 Cal.4th 81 [AIDS testing requirement, imposed as a consequence of a criminal conviction, was not punishment limited by ex post facto clause].) (*Castellanos*, *supra*, 21 Cal.4th 785, 803 (conc. opn. of Kennard, J.).)

Moreover, the *Castellanos* concurring opinion concluded, registration is not, on balance, so punitive in nature as to constitute punishment. Justice Kennard noted that although the burdens of registration have obvious deterrent purposes and effects—a characteristic of punishment—we have also identified a nonpunitive purpose of surveillance that assists police to detect and ferret out crime after it occurs. (*Castellanos, supra,* 21 Cal.4th 785, 804 (conc. opn. of Kennard, J.), citing *Wright, supra,* 15 Cal.4th 521, 527 [63 Cal.Rptr.2d 322, 936 P.2d 101].) Registration's punitive aspects, the opinion surmised, are not so overwhelming as to overcome its regulatory and nonpunitive ends. Alluding to *Hendricks, supra,* 521 U.S. 346, the opinion trenchantly observed, "It is hard

to imagine how requiring a sex offender to file an address report could be punishment when physically confining the same offender beyond the end of his criminal sentence is not." (*Castellanos, supra,* at p. 804 (conc. opn. of Kennard, J.).)

Turning to the *Mendoza-Martinez* factors, the *Castellanos* concurring opinion noted that two of these factors supported a finding of punishment— "registration comes into play only on a finding of scienter, and the behavior to which it applies is already a crime." (*Castellanos, supra,* 21 Cal.4th 785, 805 (conc. opn. of Kennard, J.).) But these considerations were outweighed, the opinion pointed out, by those supporting a nonpunitive determination: registration imposed no affirmative disability or restraint (because it imposed no restriction on personal liberty); had not historically been viewed as punishment (at least aside from the shaming effect of public *disclosure,* not applicable to Castellanos's case); served legitimate nonpunitive ends; and did not appear excessive in relation to its nonpunitive purpose. (*Id.* at p. 804.)

Thus, the *Castellanos* concurring opinion stressed, "I disagree with *Reed*[][*supra,* 33 Cal.3d 914 [191 Cal.Rptr. 658, 663 P.2d 216]] that under the *Mendoza-Martinez* factors sex offender registration is punishment." (*Castellanos, supra,* 21 Cal.4th 785, 805 (conc. opn. of Kennard, J.).) Nonetheless, citing *Austin, supra,* 509 U.S. 602, the opinion reserved the issue whether registration might be punishment under the Eighth Amendment and its California constitutional equivalent, though not punishment for ex post facto purposes. "Thus," the opinion concluded, its analysis "[did] not call *Reed*'s holding into question." (*Castellanos, supra,* at p. 805, fn. omitted.)

Last term, the United States Supreme Court confirmed beyond doubt that laws requiring the registration of convicted sex offenders—including now common provisions for public dissemination of information about the identity and whereabouts of dangerous offenders—do not impose punishment for purposes of the federal ex post facto clause. (*Smith, supra,* 538 U.S. 84.) In reaching that conclusion, the high court majority relied heavily on the multifactor test set forth in *Mendoza-Martinez, supra,* 372 U.S. 144.

At issue in *Smith* was Alaska's version of "Megan's Law," so named in memory of a seven-year-old New Jersey girl "who was sexually assaulted and murdered in 1994 by a neighbor who, unknown to the victim's family, had prior convictions for sex offenses against children." (*Smith, supra,* 538 U.S. 84, 89.) As the Supreme Court observed, "[this] crime gave impetus to laws for mandatory registration of sex offenders and corresponding community notification. In 1994, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act . . ., which conditions certain federal law enforcement funding on the States' adoption of

sex offender registration laws and sets minimum standards for state programs. By 1996, every State, the District of Columbia, and the Federal Government had enacted some variation of Megan's Law." (*Smith, supra,* at pp. 89–90.)

The Alaska statute includes both a registration requirement and a public notification provision. Both apply to past convictions. (*Smith, supra,* 538 U.S. 84, 90.) The statute requires " 'any sex offender or child kidnapper . . . physically present in the state' " to register with state or local law enforcement authorities. (*Ibid.*) One convicted of a single nonaggravated sex offense must register annually, and upon any change of address, for 15 years. For one convicted of multiple offenses, or an aggravated offense, these obligations are lifelong. Registration data is sent to the Alaska Department of Public Safety. That department is to make public substantial identifying information about registrants, including their names, aliases, addresses, photographs, physical descriptions, descriptions and license and identification numbers of vehicles, birth dates, crimes for which convicted, places and times of conviction, and terms and conditions of confinement. Alaska posts this information on the Internet.

Two men who had suffered qualifying sex offense convictions before the Alaska law was enacted filed a federal suit to void application of the law against them. They claimed that the Alaska statute's registration requirement, and its provision for invasive public disclosure of information about their identities, descriptions, whereabouts, and crimes, imposed new punishment for their prior crimes in violation of the ex post facto clause. The district court and the court of appeals agreed that the Alaska Legislature intended the statute to be nonpunitive. However, unlike the district court, the court of appeals found the law punitive in effect despite the legislative intent. On that basis, the court of appeals held that the statute violates the ex post facto clause as applied to prior crimes.

As in earlier decisions, the United States Supreme Court stated a two-pronged analysis: "If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is ' "so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil." ' [Citations.] Because we 'ordinarily defer to the legislature's stated intent,' [citation], ' "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' [citations]." (*Smith, supra,* 538 U.S. 84, 92.)

As to legislative intent, the *Smith* majority noted the following:

First, Alaska's legislature amply indicated that it intended a civil scheme for public protection. The legislature found that " 'sex offenders pose a high risk of reoffending,' " that " 'protecting the public from sex offenders' " was the statute's primary objective, and that " 'release of certain information about sex offenders to public agencies and the general public will assist in' " the goal of public protection. (*Smith, supra,* 538 U.S. 84, 93 [123 S.Ct. 1140].) "[A]n imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate nonpunitive governmental objective and has been historically so regarded.' " (*Ibid.,* quoting *Hendricks, supra,* 521 U.S. 346, 363.)

Second, even though Alaska's Constitution lists public protection as an objective of criminal administration, when a legislative restriction is an incident of the state's power to protect public health and safety, it will generally be considered as exercising that civil and remedial power, and not as adding punishment. (*Smith, supra,* 538 U.S. 84, 93–94, citing *Flemming v. Nestor* (1960) 363 U.S. 603 [4 L.Ed.2d 1435, 80 S.Ct. 1367] [termination of benefits to deported aliens] and *United States v. One Assortment of 89 Firearms* (1984) 465 U.S. 354 [79 L.Ed.2d 361, 104 S.Ct. 1099] [forfeiture of unlicensed firearms].)

Third, it is relevant, but not dispositive, that the *registration* provisions of Alaska's law are codified in its criminal procedure code. (Cf. *Hendricks, supra,* 521 U.S. 346, 361 [civil intent of law for involuntary confinement of dangerously disordered sex offenders is evidenced by statute's placement in civil code].) Many provisions of Alaska's criminal code, though perhaps related to criminal administration, are not themselves punitive. "The partial codification of the Act in the State's criminal procedure code is not sufficient to support a conclusion that the legislative intent was punitive." (*Smith, supra,* 538 U.S. 84, 95.)

Fourth, a punitive intent is not evidenced by the procedural requirement that plea advisements include notification of registration requirements. "When a State sets up a regulatory scheme, it is logical to provide those persons subject to it with clear and unambiguous notice of the requirements and the penalties for noncompliance." (*Smith, supra,* 538 U.S. 84, 96 [123 S.Ct. 1140].) Here, notice is particularly important, because noncompliance entails criminal penalties.

Fifth, the Alaska statute mandates no procedures, but vests authority in the state's department of public safety to promulgate implementing regulations. The statute itself does not require the procedures adopted to include criminal safeguards. "That leads us to infer that the legislature envisioned the Act's implementation to be civil and administrative. By contemplating 'distinctly civil procedures,' the legislature 'indicate[d] clearly that it intended a civil,

not a criminal sanction.' " (*Smith, supra*, 538 U.S. 84, 96, quoting *United States v. Ursery* (1996) 518 U.S. 267, 289 [135 L.Ed.2d 549, 116 S.Ct. 2135] (*Ursery*).)

Having concluded, for all these reasons, "that the intent of the Alaska Legislature was to create a civil, nonpunitive regime" (*Smith, supra*, 538 U.S. 84, 96), the majority next considered whether the Alaska statute was nonetheless punitive in effect. The majority observed that "[i]n analyzing the effects of the Act we refer to the seven factors noted in [*Mendoza-Martinez, supra*, 372 U.S. 144, 168–169] as a useful framework. These factors, which migrated into our *ex post facto* case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth *and Eighth* Amendments, as well as the Bill of Attainder and the *Ex Post Facto* Clauses. [Citation.] . . . [T]he *Mendoza-Martinez* factors are designed to apply in various constitutional contexts . . . ." (*Smith, supra*, at p. 97, italics added.)

"The factors most relevant to our analysis," the majority observed, "are whether, in its necessary operation, the regulatory scheme . . . has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." (*Smith, supra*, 538 U.S. 84, 97.)

Focusing on the Alaska statute's community notification provisions, the court first rejected the notion that they resemble historical "shaming" punishments such as public labeling or branding and banishment. As the court noted, the Alaska statute, unlike these early punishments, does not subject the offender to direct ostracism, humiliation, or ridicule. Instead, it simply provides for "the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." (*Smith, supra*, 538 U.S. 84, 98.) Any resulting stigma, the court explained, is incidental to the statute's purpose, not "an integral part of the objective of the regulatory scheme." (*Id.* at p. 99.)

The majority next found that Alaska's statute does not subject registrants to any affirmative disability or restraint. The majority reasoned: The registration requirements impose no physical restraint like imprisonment, or any other direct restriction on the offender's activities. The reporting obligations are less onerous than occupational disbarment, which the court has held nonpunitive. Whatever "lasting and painful impact" the public availability of registration information may have on an offender's practical ability to obtain employment and housing, "these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction,

already a matter of public record. The State makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant." (*Smith, supra,* 538 U.S. 84, 101.)[11]

The majority further concluded that any retributive or deterrent effect the Alaska statute might have does not render it punitive. A contrary theory, the majority observed, "proves too much. Any number of governmental programs might deter crime without imposing punishment. 'To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" . . . would severely undermine the Government's ability to engage in effective regulation.' [Citations.]" (*Smith, supra,* 538 U.S. 84, 102.) Nor, the majority insisted, are the registration obligations punishment because their duration varies depending on whether the underlying sex offenses are "aggravated" within the statutory definition. The majority noted that "[t]he broad categories . . . and the corresponding length of the reporting requirement, are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective." (*Ibid.*)

"The Act's rational connection to a nonpunitive purpose," the majority explained, "is a '[m]ost significant' factor in our determination that the statute's effects are not punitive. [Citation.]" (*Smith, supra,* 538 U.S. 84, 102.) The offenders conceded that the Alaska statute's "purpose of 'public safety, which is advanced by alerting the public to the risk of sex offenders in their communit[y],' " is legitimate, rational, and valid, but they argued that the law must be " 'narrowly drawn to accomplish the stated purpose.' " (*Id.* at p. 103). Not so, the majority responded; "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance. The imprecision respondents rely upon does not suggest that the Act's nonpunitive purpose is a 'sham or mere pretext.' [Citation.]" (*Id.* at p. 103.)

The majority rejected the offenders' contention that the Alaska statute is excessive in relation to its nonpunitive purpose because it (1) applies to all convicted sex offenders, regardless of their future dangerousness, (2) places

---

[11] Nor, the majority explained, are the Alaska statute's requirements sufficiently like probation or supervised release to find an affirmative disability or restraint. The majority explained: Probation and supervised release entail mandatory restrictions on behavior, violation of which can lead to revocation of the conditional liberty. Those under such supervision may require the authorities' permission to make significant life changes. By contrast, registrants under the Alaska statute are free to work, live, and change residences as they choose, without supervision. They must inform the authorities when they take certain actions, but they need not seek permission to do so. Violation of the duty to register may result in criminal prosecution, but this is in a proceeding separate from the individual's original offense. (*Smith, supra,* 538 U.S. 84, 101–102.)

no limits on the number of persons who have access to the registration information, and (3) imposes a registration requirement of excessive duration. Noting that the risk of recidivism posed by sex offenders generally is " 'frightening and high' " (*Smith, supra,* 538 U.S. 84, 103, quoting *McKune v. Lile* (2002) 536 U.S. 24, 34 [153 L.Ed.2d 47, 122 S.Ct. 2017]), the majority stressed that "Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." (*Smith, supra,* at p. 103.)

Generally, the majority noted, a legislature " 'has power in cases of this kind to make a rule of universal application,' " "without any corresponding risk assessment." (*Smith, supra,* 538 U.S. 84, 104.) The majority distinguished the involuntary confinement scheme at issue in *Hendricks, supra,* 521 U.S. 346, noting that the Alaska statute imposes "the more minor condition of registration. In the context of the regulatory scheme the State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions without violating . . . the *Ex Post Facto* Clause." (*Smith, supra,* at p. 104.)

The duration of the registration requirement is not excessive, the majority concluded, considering that "[e]mpirical research on child molesters, for instance, has shown that, '[c]ontrary to conventional wisdom, most reoffenses do not occur within the first several years after release,' but may occur 'as late as 20 years following release.' R. Prentky, R. Knight, and A. Lee, U.S. Dept. of Justice, National Institute of Justice, Child Sexual Molestation: Research Issues 14 (1997)." (*Smith, supra,* 538 U.S. 84, 104.) Moreover, the majority noted, the public notification system, though widely accessible, is passive; registration information is obtained by contacting a Web site, which warns that criminal acts against a registrant are subject to prosecution. (*Id.* at p. 105.)

The "excessiveness" inquiry, the majority explained, "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective. The Act meets this standard." (*Smith, supra,* 538 U.S. 84, 105.)

Finally, the majority found the two remaining *Mendoza-Martinez* factors—whether the regulation comes into play only upon a finding of scienter, and whether the behavior to which it applies is itself a crime—to be of little significance. The regulatory scheme, the court observed, is necessarily

founded on past conduct that was a crime, recidivism being the statutory concern. On the other hand, "[t]he obligations the statute imposes are the responsibility of registration, a duty not predicated upon some present or repeated violation." (*Smith, supra,* 538 U.S. 84, 105.)

In sum, the majority concluded, "respondents cannot show, much less by the clearest proof, that the effects of the law negate Alaska's intention to establish a civil regulatory scheme. The Act is nonpunitive, and its retroactive application does not violate the *Ex Post Facto* Clause." (*Smith, supra,* 538 U.S. 84, 105–106.)

■ Beyond doubt, section 290 is equally nonpunitive by these criteria. Our decisions, described above, have confirmed that the purpose and intent of registration are regulatory, as a means of assisting law enforcement in dealing with the serious problem of recidivist sex offenders.[12] Moreover, registration is not punitive in effect notwithstanding the legislative intent. Registration has not historically been viewed as punishment, imposes no direct disability or restraint beyond the inconvenience of compliance, and has a legitimate nonpenal objective. Though registration may have incidental deterrent or retributive effects, and applies to conduct which is already a crime, these features are not sufficient to outweigh the statute's regulatory nature. Nor is it dispositive that the registration statute appears in the Penal Code, and that the obligation to register is imposed as part of a criminal proceeding.

■ Moreover, section 290's provisions are not excessive, and therefore punitive, insofar as they (1) apply mandatory registration to a wide range of sex-related crimes, without closely assessing the danger posed by each individual offense or offender, and (2) make the registration requirement lifelong. Given the general danger of recidivism presented by those convicted of criminal sexual misconduct, and the relatively minor burden registration represents, the Legislature may adopt a rule of general application for this class of offenders, and may guard against the demonstrated long-term risk of reoffense by imposing a permanent obligation on persons convicted of such

---

[12] The Legislature confirmed this purpose by making extensive findings when it adopted public-notification provisions in 1996. Section 1 of Statutes 1996, chapter 908, declares, inter alia, that "[s]ex offenders pose a high risk of engaging in further offenses . . . , and protection of the public from these offenders is a paramount public interest" (*id.,* § 1, subd. (a)); that there is a "compelling and necessary public interest" in providing public information about convicted sex offenders in order "to allow members of the public to adequately protect themselves and their children from these persons" (*id.,* § 1, subd. (b)); that "[t]he registration of sex offenders, [and] the public release of specified information about certain . . . offenders . . . will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems that deal with these offenders" (*id.,* § 1, subd. (e)); and that the legislative policy of continued registration, and limited public disclosure, is necessary "[t]o protect the safety and general welfare of the people of this state" as a means of "assuring public protection and shall not be construed as punitive" (*id.,* § 1, subd. (f)).

crimes. (See *Smith, supra,* 538 U.S. 84, 104.) The means chosen to achieve the regulatory goal are therefore reasonable. (*Id.* at p. 105.)

Thus, by every standard set forth in such cases as *Mendoza-Martinez, McVickers, Hendricks, Castellanos,* and *Smith,* the registration requirement imposed by section 290 is not punishment, but a legitimate, nonpunitive regulatory measure. Moreover, it is clear beyond argument that *Reed, supra,* 33 Cal.3d 914, misapplied the *Mendoza-Martinez* factors to conclude otherwise.

The only question is whether sex offender registration is nonetheless "punishment" under some "broader" test that applies to the cruel and/or unusual punishment clauses in particular. We conclude that the answer is "no."

Few decisions of this court, or of the United States Supreme Court, have discussed what constitutes punishment in the specific context of the Eighth Amendment and its California counterpart. In *Fong Yue Ting v. United States* (1893) 149 U.S. 698 [37 L.Ed. 905, 13 S.Ct. 1016], the high court concluded that the deportation of Chinese aliens who violated statutory requirements for remaining in the United States was not "punishment for crime" for purposes of the due process, trial by jury, search and seizure, and cruel and unusual punishments clauses of the federal Constitution. Instead, the court held, such action was simply an exercise of the government's sovereign power to determine and enforce the conditions under which noncitizens might lawfully be present in this country. (*Id.* at p. 730.)

In *Trop, supra,* 356 U.S. 86, the court struck down, on divided grounds, a 1940 federal statute providing that a member of the armed forces, convicted by a military tribunal of wartime desertion, would automatically lose citizenship unless restored, at the military's discretion, to active wartime duty. A four-member plurality, led by Chief Justice Warren, concluded that denationalization for the crime of desertion was a cruel and unusual punishment prohibited by the Eighth Amendment.

To answer the preliminary question whether the sanction was "punishment" at all, the *Trop* plurality equated the problem with that presented under the bill of attainder and ex post facto clauses, "because these provisions apply only to statutes imposing penalties." (*Trop, supra,* 356 U.S. 86, 96 (opn. of Warren, C. J.).) "In deciding whether or not a law is penal," the plurality opinion observed, "this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal. *But a statute has been considered nonpenal if it*

*imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.* The Court has recognized that *any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect.* The controlling nature of such statutes normally depends on the evident purpose of the legislature." (*Ibid.*, italics added, fns. omitted.)

For two reasons, the *Trop* plurality concluded, the 1940 denationalization law imposed punishment. First, there were strong indications of punitive intent. Though a congressional committee considering the 1940 statute had reported that it was " 'technically . . . not a penal law,' " it was derived from similar provisions, dating to the Civil War, that the committee admitted were " 'distinctly penal in character.' " (*Trop, supra,* 356 U.S. 86, 94 (opn. of Warren, C. J.).) Second, loss of citizenship, imposed as a consequence of crime, was clearly punitive in nature. Divestment of citizenship for wartime desertion was not like deportation of aliens engaged in espionage, or denaturalization of persons who had falsified their citizenship applications. These, despite their "severe penal effect," had been upheld as nonpunitive exercises of the sovereign power to set conditions for the presence, and the naturalization, of noncitizens. (*Id.* at p. 98.) By contrast, "[t]he purpose of taking away citizenship from a convicted deserter is simply to punish him. *There is no other legitimate purpose that the statute could serve.*" (*Id.* at p. 97, italics added.)

Justice Brennan, who supplied the fifth vote against the statute, reasoned simply that expatriation for military desertion is beyond any enumerated power of Congress, such as the foreign affairs or war power, because it has no logical nexus to the exercise of any such powers. (*Trop, supra,* 356 U.S. 86, 105–114 (conc. opn. of Brennan, J.).) Justice Frankfurter disagreed in result with both the plurality and Justice Brennan. In Justice Frankfurter's view, loss of nationality was a logical consequence of failing to perform wartime military duty, a basic obligation of citizenship. Congress could properly so provide, Justice Frankfurter concluded, as a nonpenal incident of its power to regulate military affairs. "Since there are legislative ends within the scope of Congress' war power that are wholly consistent with a 'nonpenal' purpose to regulate the military forces, and since there is nothing on the face of [the 1940] legislation or in its history to indicate that Congress had a contrary purpose, there is no warrant for this Court's labeling the disability imposed by [the statute] as a 'punishment.' " (*Trop, supra,* at p. 125 (dis. opn. of Frankfurter, J.).)[13]

---

[13] The court subsequently held that Congress has no express or implied power to strip a person of citizenship under any circumstances. (*Afroyim v. Rusk* (1967) 387 U.S. 253 [18 L.Ed.2d 757, 87 S.Ct. 1660], overruling *Perez v. Brownell* (1958) 356 U.S. 44 [2 L.Ed.2d 603,

In *Uphaus v. Wyman* (1959) 360 U.S. 72 [3 L.Ed.2d 1090, 79 S.Ct. 1040], the court upheld a judgment of contempt that ordered the appellant jailed until he complied with the informational demands of a congressional investigating committee. Rejecting a cruel and unusual punishment challenge, among others (see *id.* at p. 73), the court reasoned that such coercion " 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.' " (*Id.* at p. 81, quoting *Green v. United States* (1958) 356 U.S. 165, 197 [2 L.Ed.2d 672, 78 S.Ct. 632] (dis. opn. of Black, J.).) More recently still, the court found that the Eighth Amendment does not protect against the paddling of public school students, because such discipline does not constitute punishment for persons convicted of crimes. (*Ingraham v. Wright* (1977) 430 U.S. 651, 664 [51 L.Ed.2d 711, 97 S.Ct. 1401].)

█ Despite variations in wording, and occasional disagreements in result, these cases indicated a loose consensus about the standards for determining what is punishment for purposes of the Eighth Amendment. To qualify, the burden or disability must be imposed as a consequence of a law violation, and must either be intended as punishment, or have no other legitimate aim. Measures imposed within the legislative power, that were intended as civil and nonpunitive and had a legitimate regulatory purpose, were not deemed punishment for this purpose, even if they had substantial—even harsh and severe—penal consequences. By these standards, for the reasons set forth above, the mandatory registration of convicted sex offenders is not punishment.

Concern that the high court has since adopted a more stringent definition of punishment for Eighth Amendment purposes stems essentially from the high court's 1993 decision in *Austin, supra,* 509 U.S. 602. There, after a South Dakota court convicted petitioner Austin of cocaine possession with intent to distribute, the United States filed an in rem action to seize Austin's mobile-home and auto body shop involved in the drug transaction. The government's action was premised on federal statutes which called for the forfeiture of all vehicles and real property used in the manufacture, sale, distribution, or concealment of illegal drugs, but which excepted any interest so used without the owner's knowledge and consent. The lower courts rejected Austin's claim of an Eighth Amendment violation. The United States Supreme Court reversed.

The government argued that the Eighth Amendment in general, and its excessive fines clause in particular, applied only to *criminal*, not civil, penalties. The court rejected this contention. It reasoned that, unlike some

78 S.Ct. 568] [upholding law providing for denationalization as consequence of voting in foreign election].)

other constitutional guarantees, such as the self-incrimination, speedy trial, confrontation, and right-to-counsel provisions, that apply specifically to criminal cases, the Eighth Amendment contains no such limitation, and was intended to limit the government's power to punish *generally*. (*Austin, supra*, 509 U.S. 602, 607–610.)

For this reason, the court suggested, the government was also wrong to assert that "the Eighth Amendment cannot apply to a civil proceeding unless that proceeding is so punitive that it must be considered criminal under [*Mendoza-Martinez, supra*, 372 U.S. 144] and [*Ward, supra*, 448 U.S. 242] [holding that a proceeding to assess a civil penalty against a water polluter was not "so criminal in its nature" as to invoke the protections of the Fifth Amendment's privilege against self-incrimination]." (*Austin, supra*, 509 U.S. 602, 607.) "The question in those cases," the court declared, "was whether a nominally civil penalty should be reclassified as criminal and the safeguards that attend a criminal prosecution should be required." (*Id.* at p. 610, fn. 6.)

When deciding if a sanction is punishment, whether civil or criminal, the court noted, "[w]e need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause. We, however, must determine *that it can only be explained as serving in part to punish*. . . . '[A] civil sanction that cannot fairly be said *solely to serve a remedial purpose*, but rather can *only be explained* as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.' [Citation.]" (*Austin, supra*, 509 U.S. 602, 610, italics added, quoting *United States v. Halper* (1989) 490 U.S. 435, 448 [104 L.Ed.2d 487, 109 S.Ct. 1892] (*Halper*) [holding that per-violation "civil penalty" far in excess of actual damage was "punishment" for purposes of double jeopardy clause].)

Applying this test, the court first determined that, prior to ratification of the Eighth Amendment, "forfeiture was understood at least in part as punishment." (*Austin, supra*, 509 U.S. 602, 610–611; see also *id.* at pp. 611–618.) Moreover, the court explained, statutes and case law since the Republic's earliest days had recognized that forfeiture of property, whether imposed in a criminal, civil, or in rem proceeding, broadly punishes the owner for some form of culpability, willful or negligent, in its use or management. (*Id.* at pp. 613–619.)

Next, the court examined the statutes directly at issue, 21 United States Code section 881(a)(4) and (a)(7), to determine whether "forfeitures under [those statutes] are properly considered punishment today." (*Austin, supra*, 509 U.S. 602, 619.) "[N]othing in these provisions or their legislative history," the court concluded, "contradict[s] the historical understanding of

forfeiture as punishment." (*Ibid.*) Congress had tied the forfeiture directly to the commission of drug offenses (*id.* at p. 620), and had emphasized culpability by inserting "an 'innocent owner' defense" unavailable at common law (*id.* at p. 619). The legislative history further indicated a punitive intent; relevant congressional reports argued that traditional criminal sanctions were " 'inadequate to deter or punish the enormously profitable trade in dangerous drugs' " and that forfeiture of real property used in such offenses would be a " 'powerful deterrent.' " (*Id.* at p. 620.)

The government argued that the forfeiture provisions were "remedial" in two respects—they protected the community by removing the "instruments" of the drug trade, and they compensated the government for the law enforcement and societal costs of this trade. Neither theory, the court responded, withstood scrutiny. While the removal of *contraband itself* might be considered remedial, this concept could not be stretched to the seizure of otherwise legal property as a mere consequence of its use for illegal purposes. And given the widely varying values of the property confiscated under these statutes, such forfeiture " '[is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law.' [Citation.]" (*Austin, supra,* 509 U.S. 602, 621.)

In any event, the court declared, "even assuming that [21 United States Code section] 881(a)(4) and (a)(7) serve[s] some remedial purpose, the Government's argument must fail. '[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.' [Citation.]" (*Austin, supra,* 509 U.S. 602, 621 [113 S.Ct. 2801], italics added by *Austin.*) Given the historical understanding of forfeiture as punishment, the statutes' focus on the culpability of the property's owner, and the evidence that Congress intended the forfeiture provisions to deter and punish, "we cannot conclude that forfeiture under [section] 881(a)(4) and (a)(7) serves solely a remedial purpose. We therefore conclude that forfeiture under these provisions constitutes 'payment to a sovereign as punishment for some offense,' [citation], and, as such, is subject to the limitations of the Eighth Amendment's Excessive Fines Clause." (*Austin, supra,* at p. 622, fn. omitted.) The court reversed and remanded for a determination whether the penalty was unconstitutionally "excessive." (*Id.* at pp. 622–623.)

The court applied similar reasoning in a later forfeiture case, *United States v. Bajakajian* (1998) 524 U.S. 321 [141 L.Ed.2d 314, 118 S.Ct. 2028] (*Bajakajian*). There, a federal statute provided that one must report the transportation of more than $10,000 in currency out of the United States. One convicted of willfully violating the reporting requirement faced forfeiture of all currency involved in the offense. Airport customs officials, alerted by

currency-sniffing dogs, found some $230,000 in cash in the luggage of Bajakajian and his family, who were boarding a flight to Italy, en route to Cyprus. When approached and advised of the reporting requirement, Bajakajian said the family was carrying only $15,000 in cash. Further searches of the family's effects produced an additional $127,000 in bills, for a total of approximately $357,000.

Count 1 of the resulting indictment charged Bajakajian with a "willful[]" reporting violation; count 2 charged a material misstatement to a customs official; and count 3 sought forfeiture of the unreported cash. Bajakajian pled guilty to count 1, and count 2 was dismissed. After a trial on count 3, the court found that Bajakajian, who had grown up in Syria's Armenian community, was carrying the currency to repay a lawful debt, and had failed to report the cash because of a culturally based distrust of government. Nonetheless, pursuant to the statute, the court ordered forfeiture of the entire $357,000 "involved" in the reporting offense.

Addressing Bajakajian's Eighth Amendment objection, a five-justice majority had "little trouble" (*Bajakajian, supra*, 524 U.S. 321, 328) concluding that the forfeiture was punishment, i.e., a fine governed by the excessive fines clause. The majority reasoned as follows: The federal statute, 18 United States Code section 982(a)(1), "direct[ed] a court to order forfeiture as an additional sanction when 'imposing sentence on a person convicted of' a willful [reporting] violation." (*Bajakajian, supra*, at p. 328.) The forfeiture was thus imposed at the culmination of a criminal proceeding, upon conviction of the underlying felony; it could not be imposed on an "innocent owner of unreported currency." (*Ibid.*) Hence, this forfeiture statute resembled those at issue in *Austin, supra*, 509 U.S. 602, which " 'expressly provide[d] an "innocent owner" defense' and thus 'look[ed] . . . like punishment.' " (*Bajakajian, supra*, at p. 328, quoting *Austin, supra*, at p. 619.) Furthermore, the statute prescribed a form of in personam criminal forfeiture, against the offending owner directly, that has traditionally been viewed as punitive. (*Bajakajian, supra*, at pp. 329–332.) Contrary to the government's arguments, the forfeiture of all currency, otherwise legally possessed and transported, that was involved in a mere reporting violation could not be found nonpunitive on grounds that it confiscated the "instrumentalities" of crime and compensated the government for law enforcement costs. The government acknowledged the deterrent purpose of the sanction *and admitted it had a penal component.* Under these circumstances, even if the forfeiture also served some remedial purpose, "the forfeiture would still be punitive in part. (The Government

concedes as much.) This is sufficient to bring the forfeiture within the purview of the Excessive Fines Clause. [Citation.]" (*Id.* at p. 329, fn. 4.)[14]

We assume, for purposes of this opinion, that the test of "punishment" set forth in *Austin, supra,* 509 U.S. 602, and *Bajakajian, supra,* 524 U.S. 321, was intended to apply not only to fines and forfeitures, as viewed under the excessive fines clause, but in other Eighth Amendment contexts as well. We also assume those decisions contemplated a test under which some measures might be considered punitive for Eighth Amendment purposes, even if not so under other constitutional provisions, such as the ex post facto and double jeopardy clauses. Nonetheless, *Austin* and *Bajakajian* do not alter our determination that sex offender registration is not punishment for purposes of the Eighth Amendment.

■ *Austin, supra,* 509 U.S. 602, and *Bajakajian, supra,* 524 U.S. 321, do not say that every measure, however legitimately remedial in purpose and design, is nonetheless "punishment" subject to scrutiny under the Eighth Amendment if it has any deterrent or retributive *effect.* On the contrary, *Austin* was at pains to explain that a measure will be deemed punishment in this context to the extent it can *only* be explained as serving, at least in part, a punitive *purpose.* (*Austin, supra,* at p. 621; see also *Bajakajian, supra,* at p. 329, fn. 4; cf. *Halper, supra,* 490 U.S. 435, 448.) In other words, a sanction designed and intended only to serve legitimate nonpenal objectives is not punishment under the Eighth Amendment simply because it may burden, inconvenience, restrict, or deter *in fact.* Were it otherwise, large numbers of regulatory measures—including those consistently upheld against other constitutional claims of punishment—would be subject to close examination under the Eighth Amendment.

We thus agree with the analysis of the New Jersey Supreme Court, which, in a post-*Austin* decision, upheld that state's Megan's Law against an Eighth Amendment attack. The New Jersey court explained, "Our review of the law leads to the following conclusions: a statute that can fairly be characterized as remedial, both in its purpose and implementing provisions, does not constitute punishment [for the sole reason that] its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions. Such a law does not become punitive simply because its impact, in part, may be punitive

---

[14] Proceeding to the question whether the forfeiture at issue was an "excessive" fine, the majority answered in the affirmative. The majority concluded that forfeiture of the full $357,000, otherwise legally possessed and transported, for a reporting violation was grossly disproportionate to the gravity of Bajakajian's crime, viewed in terms of its moral culpability and the actual harm caused. Nor, the majority reiterated, could forfeiture of the entire amount be justified on remedial grounds. (*Bajakajian, supra,* 524 U.S. 321, 334–344.)

unless the only explanation for that impact is a punitive purpose: an intent to punish." (*Doe v. Poritz* (N.J. 1995) 142 N.J. 1 [662 A.2d 367, 388].)

To determine that the forfeiture provisions at issue in *Austin, supra,* 509 U.S. 602, and *Bajakajian, supra,* 524 U.S. 321, could only be explained, in part, as serving a punitive purpose, the court in both cases stressed that such exactions were traditionally viewed as punishment. The court also noted that the forfeitures were not tailored to legitimate nonpunitive goals, and that the evidence indicated a *legislative intent,* at least in part, to deter and punish. (*Bajakajian, supra,* at pp. 329–332; *Austin, supra,* at pp. 610–620.)

▪ By contrast, as indicated above, the high court has since confirmed that sex offender registration does not resemble historical forms of punishment. Recently examining the Alaska registration statute, the court found it was intended and designed solely to serve nonpunitive goals of public safety. (See discussion, *ante.*) We, in turn, have consistently emphasized that the acts mandated by California's registration law are intended to assist law enforcement to maintain surveillance of recidivist sex offenders, and have no purpose to punish for past misconduct. (See discussion, *ante.*) The Legislature itself has now expressly declared that the registration provisions are necessary for public safety (Stats. 1996, ch. 908, § 1, subds. (e), (f)) and "shall not be construed as punitive" (*id.,* § 1, subd. (f)).

We realize occasional statements, in both our jurisprudence and that of the high court, can be read to state that sex offender registration and notification statutes have not only a deterrent effect, but a deterrent purpose.[15] Despite this, we are not persuaded that California's provision for confidential registration of convicted sex offenders such as Alva comes within the Eighth Amendment definition of "punishment."

▪ Even if the Legislature *intended,* as one desirable result of registration, that convicted sex offenders would be discouraged from reoffending by the increased risk of detection and apprehension, this is not, in our view, the kind of "retributive or deterrent purpose" that "punishment" analysis is intended to address. ▪ The object of punishment is to exact retribution for past misconduct, and to deter future transgressions *by imposing painful*

---

[15] (See, e.g., *Smith, supra,* 538 U.S. 84, 102 [state conceded Alaska registration/notification statute "might deter future crimes," but mere presence of "deterrent purpose" does not render measure "criminal" for ex post facto purposes]; *Castellanos, supra,* 21 Cal.4th 785, 796 (lead opn. of George, C. J.) [§ 290 is " 'intended to promote the " 'state interest in controlling crime and preventing recidivism' " ' "]; *Castellanos, supra,* at p. 803 (conc. opn. of Kennard, J.) [same]; *Wright, supra,* 15 Cal.4th 521, 527 [same]; *Wright, supra,* at p. 530, fn. 3, quoting *In re Parks* (1986) 184 Cal.App.3d 476, 481 [229 Cal.Rptr. 202] [" '[s]ection 290 was enacted to deter recidivism by facilitating the apprehension of repeat offenders' "].)

*consequences for violations already committed.* Penal deterrence operates by warning the offender, and others tempted to commit the same violation, of the price to be paid for such actions. ▓▓ Section 290 has no such purpose. By providing for the collection of information about the identity and whereabouts of convicted sex offenders, the statute simply makes it harder for such persons to reoffend without getting caught. If deterrence is a natural, probable, and even purposeful consequence of this regulatory scheme, that does not make it punitive.[16]

▓▓ Since *Austin, supra,* 509 U.S. 602, was decided, the high court has recognized in other contexts that not all deterrence is penal in nature. (See *Smith, supra,* 538 U.S. 84, 102 [for ex post facto purposes, sex offender registration law is not punishment simply because deterrent in part]; *Ursery, supra,* 518 U.S. 267, 292 [for double jeopardy purposes, deterrence may serve civil as well as criminal goals]; *Bennis v. Michigan* (1996) 516 U.S. 442, 452 [134 L.Ed.2d 68, 116 S.Ct. 994] [for purposes of "takings" clause, forfeiture may serve deterrent purposes apart from any punitive purpose]; see also *Hudson v. United States* (1997) 522 U.S. 93 [139 L.Ed.2d 450, 118 S.Ct. 488] (*Hudson*) [deeming "solely remedial purpose" test "unworkable" for double jeopardy purposes, since all regulatory sanctions are deterrent to some degree].)[17] Under these circumstances, we remain convinced that the mandatory registration of convicted sex offenders is not "punishment" for

---

[16] A contrary determination might bring many well-established regulatory tools under Eighth Amendment scrutiny. For example, state and federal law is rife with requirements that businesses submit reports, and maintain records subject to government inspection, regarding specified details of their operations. (See, e.g., *Craib v. Bulmash* (1989) 49 Cal.3d 475, 478–479 [261 Cal.Rptr. 686, 777 P.2d 1120] [employee identification and payroll records].) Such measures help the government to monitor the conduct of such entities and to identify violators of both penal and regulatory laws. For that very reason, they certainly have a deterrent *effect* on the commission of such violations, and this effect may even have been contemplated by the legislators who adopted the reporting requirements. But were this form of deterrence subject to Eighth Amendment examination, legitimate regulatory efforts would be sorely tested. Indeed, as the concurring opinion in *Castellanos, supra,* 21 Cal.4th 785, observed, "[r]equiring automobile owners to register their vehicles aids in the detection of crime, but that does not make registration punishment." (*Id.* at p. 804 (conc. opn. of Kennard, J.).)

[17] In this regard, the high court has signalled that it finds the "solely remedial purpose" language of *Austin, supra,* 509 U.S. 602, troublesome, and may not intend it to have wide application. This language in *Austin* derived from *Halper, supra,* 490 U.S. 435, a double jeopardy case involving monetary sanctions. *Halper* held that a $2,000 "civil penalty" assessed for each of 65 violations of the federal False Claims Act (in a case where the total sum fraudulently obtained was $600) was "punishment" under the double jeopardy clause, thus precluding later criminal prosecutions for the same violations. To reach this result, *Halper* concluded for the first time that the double jeopardy clause extended to all "punishment," whether labeled "criminal" or "civil," and determined that a sanction was "punishment" for this purpose if it could not "fairly be said solely to serve a remedial purpose, but rather [could] only be explained as also serving either retributive or deterrent purposes" (*Halper, supra,* at p. 448), as where a fixed-fee penalty was "overwhelmingly disproportionate" to the damage

purposes of the Eighth Amendment simply because it may hinder and discourage new crimes by increasing the ability of law enforcement agencies to monitor such persons, to detect the identity of reoffenders, and to locate and apprehend them if and when they reoffend.

　　■　Furthermore, even assuming that lack of a punitive *purpose* does not necessarily exempt a measure from Eighth Amendment scrutiny, we note, as above, that section 290 is not punitive by nature *despite* its purely regulatory and remedial purpose.[18] As indicated above, the registration provisions set forth in the statute appear tailored to the regulatory goal. As applicable to Alva's crime, section 290 simply requires a convicted offender to provide, and to update at specified intervals, information logically calculated to assist law enforcement authorities to monitor his or her whereabouts, while it protects the offender's privacy by carefully restricting the public dissemination of this information. Given the "'frightening and high'" danger of long-term recidivism by this class of offenders (*Smith, supra,* 538 U.S. 84, 103; see also Stats. 1996, ch. 908, § 1, subd. (a)), the permanent nature of the registration obligation also is designed to serve legitimate regulatory aims.

　　■　Nor, we believe, is sex offender registration punitive under the Eighth Amendment, except as applied only to those individual offenses and offenders that have been demonstrated to present a requisite risk of dangerous recidivism. Here, as in the ex post facto context (see *Smith, supra,* 538 U.S. 84, 103–104), the Legislature must have regulatory leeway to deal with the serious problem of recidivist sex offenses. Though Alva suggests otherwise, this leeway certainly extends to crimes that involve or promote the

---

actually caused (*id.* at p. 449). In *Hudson, supra,* 522 U.S. 93, decided after *Austin* (but before *Bajakajian, supra,* 524 U.S. 321 [141 L.Ed.2d 314]), the high court overruled *Halper. Hudson* explained that *Halper* had erred in two respects: first, insofar as it applied double jeopardy principles to "civil" sanctions, and second, insofar as it departed from the *Mendoza-Martinez* test to conclude that a sanction must be "solely remedial" to escape a designation as "punishment" for double jeopardy purposes. The *Hudson* court observed, inter alia, that "[a]s subsequent cases have demonstrated, *Halper*'s test for determining whether a particular sanction is 'punitive,' and thus subject to the strictures of the Double Jeopardy Clause, has proven unworkable. We have since recognized that all civil penalties have some deterrent effect. See *Department of Revenue of Mont. v. Kurth Ranch* [(1994)] 511 U.S. 767, 777, [fn.] 14 [128 L.Ed.2d 767, 114 S.Ct. 1937]; [*Ursery, supra,*] 518 U.S. 267, 284–285, [fn.] 2 . . . . If a sanction must be 'solely' remedial (*i.e.,* entirely nondeterrent) to avoid implicating the Double Jeopardy Clause, then no civil penalties are beyond the scope of the Clause. . . ." (*Hudson, supra,* at pp. 101–102.) The same general principle applies, for Eighth Amendment purposes, to regulatory sanctions, such as registration, imposed on recidivist sex offenders.

[18] Because *Austin, supra,* 509 U.S. 602, and *Bajakajian, supra,* 524 U.S. 321, found that the forfeiture provisions there at issue were *punitive* in their *purpose,* at least in part, those decisions had no occasion to determine whether, despite a *wholly remedial purpose,* a measure might nonetheless be so *punitive in nature* as to constitute "punishment" for Eighth Amendment purposes. We express no view on the subject, except to note that we find no such punitive nature in section 290.

pornographic exploitation of children. In furtherance of its regulatory goal, the Legislature may extend its monitoring provisions to this general class of offenses, without precise calibration of the risks and dangers presented in each individual case. Even if the statute affords less than a "close or perfect fit" with its nonpunitive aims (*id.* at p. 103), that does not mean it "can only be explained," to that extent, as serving a punitive purpose (*Austin, supra,* 509 U.S. 602, 610, 621), or that it is otherwise "punishment" as the Eighth Amendment uses that term.[19]

For all these reasons, we conclude that section 290, insofar as it requires certain convicted sex offenders to register with law enforcement authorities, does not impose "punishment" subject to scrutiny under the Eighth Amendment to determine whether such punishment is "cruel and unusual."[20]

---

[19] Both *Austin, supra,* 509 U.S. 602, and *Bajakajian, supra,* 524 U.S. 321, indicated, inter alia, that the forfeitures there at issue—of *all* property or currency involved in the underlying offenses—could not be justified on the nonpunitive ground that they reimbursed the government for associated costs or damage, because they bore no correlation to such demonstrated costs or damage, and even if they had some remedial purpose, they were still punishment insofar as they could only be explained, at least in part, as punitive. (See *Austin, supra,* at pp. 621–622; *Bajakajian, supra,* at p. 329 & fn. 4.) At oral argument, Alva's counsel suggested this means a sanction must *exactly* serve its legitimate remedial purpose, such that any disability imposed beyond what is minimally necessary to achieve a proven regulatory, compensatory, or remedial need is "punishment" for purposes of the Eighth Amendment. In the context presented here, we disagree. As counsel for respondent has observed, governmental exactions of money and property, such as those at issue in *Austin* and *Bajakajian,* are historically viewed as punishment to the extent not closely applied to compensatory or remedial ends. Moreover, because the intrinsic value of such exactions is quantifiable, it makes some sense, in the Eighth Amendment context, to hold that the government must separate those portions which are solely remedial from the remainder, which are necessarily punitive. By contrast, sex registration is not historically viewed as punishment at all, and the means necessary to serve its legitimate regulatory aims are not so clearly quantifiable. Thus, even if section 290 lacks the precise fit upon which Alva insists, this does not mean the statute can only be explained, at least in part, as punishment.

[20] In reaching this conclusion, we join the vast majority of decisions, both federal and state, and decided both before and after *Austin, supra,* 509 U.S. 602, which have concluded that because sex offender registration laws do not impose "punishment," they do not violate constitutional provisions banning punishments that are cruel and/or unusual. (E.g., *Cutshall v. Sundquist* (6th Cir. 1999) 193 F.3d 466, 477 [Tenn. statute; neither registration nor public notification provisions are punishment]; *Roe v. Farwell* (D.Mass. 1998) 999 F.Supp. 174, 192–193 [Mass. statute; registration provisions are not punishment; certain public access provisions are punishment, but not cruel and unusual]; *Lanni v. Engler* (E.D.Mich. 1998) 994 F.Supp. 849, 854–855 [Mich. statute; neither registration nor public access provisions are punishment]; *Alan A. v. Verniero* (D.N.J. 1997) 970 F.Supp. 1153, 1193–1194 [N.J. statute; community notification provisions are not punishment, and are not cruel]; *Doe v. Kelley* (W.D.Mich. 1997) 961 F.Supp. 1105, 1112 [Mich. statute; public access provisions not punishment]; *Doe v. Weld* (D.Mass. 1996) 954 F.Supp. 425, 434–436 [Mass. statute; neither registration nor community notification provisions are punishment as applied to juvenile offenders]; *State v. Cameron* (1996) 185 Ariz. 467 [916 P.2d 1183, 1185–1186] [mandatory registration of misdemeanor sex offenders is not punishment]; *In re J.W.* (2003) 204 Ill.2d 50

For similar reasons, we believe that *Reed, supra,* 33 Cal.3d 914, erred by reaching a contrary conclusion under the California Constitution's "cruel or unusual punishment" clause. We see no basis to find a different meaning of "punishment" for state purposes than would apply under the Eighth Amendment.

■ We recognize that article I, section 17 of the California Constitution bans "cruel *or* unusual punishment" (italics added), while the federal clause prohibits only "cruel *and* unusual punishments" (italics added). Even if this implies that the state clause may proscribe some "punishment[s]" that the federal clause would allow (cf., e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 602 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Dillon* (1983) 34 Cal.3d 441, 477–482 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*); *In re Lynch* (1972) 8 Cal.3d 410, 424–429 [105 Cal.Rptr. 217, 503 P.2d 921] (*Lynch*); *People v. Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]; but see Cal. Const., art. I, § 27), we have never suggested that article I, section 17 employs a different or broader definition of "punishment" itself than applies under the Eighth Amendment.

*Reed* itself implied the contrary by relying heavily upon *federal* authority, particularly *Mendoza-Martinez, supra,* 372 U.S. 144, that interpreted the *federal* Constitution. (*Reed, supra,* 33 Cal.3d 914, 919–922 [191 Cal.Rptr. 658].) As we have seen, however, intervening developments (1) show that *Reed* misapplied the test by which it purported to determine punishment,

---

[787 N.E.2d 747, 761–762, 272 Ill.Dec. 561], cert. denied, 540 U.S. 873 [157 L.Ed.2d 133, 124 S.Ct. 222] [neither registration nor public notification provisions applicable to juveniles are punishment]; *People v. Malchow* (2000) 193 Ill.2d 413 [739 N.E.2d 433, 440–441, 250 Ill.Dec. 670] [same, as applied to adults]; *In re Ayres* (1999) 239 Mich.App. 8 [608 N.W.2d 132, 135–139] [registration provisions applicable to juvenile offenders are not punishment]; *Doe v. Poritz, supra,* 662 A.2d 367, 405 [neither registration nor community notification provisions are punishment]; *State v. Dobies* (2001) 147 Ohio App.3d 568 [2001 Ohio 8823, 771 N.E.2d 867, 871] [neither registration nor community notification requirements imposed on sexual predators are punishment]; *Meadows v. Board of Parole* (2002) 181 Ore.App. 565 [47 P.3d 506, 513] [designation as sexual predator, with consequent registration and community notification, is not punishment]; *Meinders v. Weber* (2000) 2000 SD 2 [604 N.W.2d 248, 262, fn. 5] [lifetime registration and public access provisions, as applied to specified sex offenses including possession of child pornography, are not punishment]; *Ex parte Robinson* (Tex.Crim.App. 2003) 116 S.W.3d 794, 797–798 [sex offender registration provisions are not punishment]; *Snyder v. State* (Wyo. 1996) 912 P.2d 1127, 1131 [sex offender registration provisions are not punishment]; but see *State v. Snelling* (1999) 266 Kan. 986 [975 P.2d 259, 260–262] [though Kan. Supreme Ct. previously held that public access provisions of Kansas registration law are "punishment" for ex post facto purposes, such provisions do not impose "cruel and unusual" punishment as applied to one convicted of "sexually violent crime"]; *State v. Scott* (1998) 265 Kan. 1 [961 P.2d 667, 670–677] [same, as applied to conviction for aggravated sexual battery].)

and (2) render unpersuasive *Reed*'s characterization of sex offender registration as punitive.[21]

■ We therefore conclude that mandatory sex offender registration, as provided by section 290, is not "punishment" for purposes of either the Eighth Amendment or article I, section 17 of the California Constitution. To the extent *In re Reed, supra*, 33 Cal.3d 914 [191 Cal.Rptr. 658, 663 P.2d 216], reached a contrary determination under the California Constitution, *Reed* is hereby overruled.

## CONCLUSION

Our holding means that the registration requirement imposed upon Alva, who was convicted of one of the offenses covered by the sex offender

---

[21] In particular, *Reed* erred, for several reasons, in concluding that sex registration was "punishment," for purposes of California's ban on cruel or unusual punishment, because it imposed obligations disproportionate to the arguably minor offense at issue in that case (public lewd conduct), and because "it [was] not clear that the measure is effective in practice." (*Reed, supra*, 33 Cal.3d 914, 922 & fn. 7; also cf. *Castellanos, supra*, 21 Cal.4th 785, 798 (lead opn. of George, C. J.).) First, *Reed* made these observations while purporting to apply the *Mendoza-Martinez* factor concerning whether a regulatory measure is excessive in relation to its nonpunitive purpose. However, newer decisions make clear that registration is not an excessive means of regulating the problem of recidivist sex crime, even when applied categorically, and without precise calibration of the risks and dangers posed by each covered offense and offender. (*Smith, supra*, 538 U.S. 84, 103–104; *Castellanos, supra*, 21 Cal.4th 785, 796 (lead opn. of George, C. J.); see also *id.* at p. 804 (conc. opn. of Kennard, J.).) By similar reasoning, a regulatory measure need not be proven perfectly *effective* in order to avoid the label of "punishment." Second, a claim of cruel and/or unusual punishment involves *two* questions; first, whether the sanction is punishment, and second, if so, whether it is cruel and/or unusual. *Reed* conflated the two issues, wrongly reasoning that disproportionality *to the crime* was a factor in determining the initial, or threshold, issue whether the sanction was punishment at all. To the contrary, this form of disproportionality analysis applies only at the second stage, where punishment has already been found or assumed, and the only remaining question is whether such punishment is constitutionally excessive. (See *Dillon, supra*, 34 Cal.3d 441, 478 [sentence for first degree murder as grossly disproportionate on particular facts]; *Lynch, supra*, 8 Cal.3d at pp. 414–424 [one-year-to-life prison term for second lewd-exposure conviction].) Third, to the extent *Reed* based its holding on evidence that mandatory sex registration of public lewdness misdemeanants simply overwhelmed the police computers then in use, and was thus " 'dysfunctional' " (*Reed, supra*, at p. 922, fn. 7), that analysis is blunted by intervening advances in technology. Moreover, in more recent times the Department has made clear to the Legislature its view that mandatory sex offender registration generally is a highly effective law enforcement tool in dealing with recidivist sexual misconduct. (See, e.g., Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3513 (1993–1994 Reg. Sess.) (Assem. Bill No. 3513) as amended June 2, 1994, p. 5; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3513 as amended Aug. 26, 1994, p. 3.)

registration statute, must be upheld. Because the Court of Appeal reached the same result (by finding that registration, even if punishment, was not cruel and/or unusual in Alva's case), the Court of Appeal's judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.