[No. H034639. Sixth Dist. June 8, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH LOWELL GERBER, Defendant and Appellant.

**COUNSEL**

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Nanette Winaker, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ELIA, Acting P. J.**—Defendant Joseph Lowell Gerber appeals from a judgment of conviction of possession of child pornography (Pen. Code, § 311.11, subd. (a))[1] (count one), annoying or molesting a child (§ 647.6, subd. (a)) (count two), furnishing marijuana to a minor under 14 years of age (Health & Saf. Code, § 11361, subd. (a)) (count three), and two counts of furnishing a controlled substance to a minor (Health & Saf. Code, § 11353) (counts four and five).

On appeal, defendant challenges the sufficiency of the evidence to support the conviction of possession of child pornography (§ 311.11) and raises claims of ineffective assistance of counsel and instructional error. In addition, he asserts that the trial court lacked authority to make its no-contact order.

We hold that the phrase "the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct" in section 311.11 requires a real child to have actually engaged in or simulated the

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

sexual conduct depicted. We reverse the conviction of possession of child pornography in violation of section 311.11 based on the insufficiency of the evidence (count one) and we reverse the convictions of furnishing a controlled substance to a minor in violation of Health and Safety Code section 11353 (counts four and five) based on instructional error. We also strike the no-contact order.

## A.  *Procedural History*

By information filed September 5, 2008, defendant was charged with the five counts. At the commencement of the jury trial, the clerk read the information, which alleged in counts four and five that defendant violated Health and Safety Code section 11353 by providing the victim with a controlled substance, namely cocaine base.

After the prosecution rested and defense counsel indicated that no evidence would be presented on behalf of defendant, the court and counsel discussed the jury instructions off the record. Back on the record, out of the jury's presence, defense counsel and the court discussed the situation that the evidence showed defendant provided cocaine on three occasions, the second of which was outside of Santa Clara County, and the information charged defendant with two violations of Health and Safety Code section 11353.

When court reconvened the next morning, the People received permission to file a first amended information conforming to proof as to counts four and five. The first amended information specified that count four was "The First Time" and count five was "The Third Time." After the prosecution briefly re-called a witness, the trial court then proceeded to instruct the jury. In its jury instructions, the court read the charges in the information, including counts four and five alleging defendant furnished cocaine base to the minor victim. But the court instructed as to counts four and five that the People were required to prove that the "controlled substance was cocaine and methamphetamine."

During subsequent closing argument, the prosecutor argued that, as to counts four and five, the controlled substance furnished or given away by defendant was "cocaine and/or methamphetamine." She explained that count four was the first time defendant and the victim used cocaine at defendant's house in Milpitas and count five referred to the third time defendant used cocaine with the victim and then told her to pose for pictures. The prosecutor specified that the second time they used cocaine, an incident at a park, was not a charged offense because that incident occurred outside Santa Clara County.

During deliberations, the court received several communications from the jury. On the second day of deliberations, the jury sent a third communication, which asked the court in essence whether "meth" was interchangeable with cocaine in counts four and five and whether the controlled substance cocaine base specified in counts four and five included "meth." Out of the jury's presence, the prosecutor indicated that the People wished to amend counts four and five of the information to conform to proof to read "cocaine base and/or methamphetamine." The court permitted that amendment. Defendant waived arraignment but objected to the amendment. In counts four and five of the first amended information as amended, the phrase "and/or methamphetamine" is interlineated in handwriting after "cocaine base."

Following that third jury communication, the trial court provided a written response and a supplemental instruction. The communication was returned with a handwritten message from the judge: "We have amended the Information to add methamphetamine as a controlled substance and clarified instruction 2380 to say cocaine base and/or methamphetamine see attached. As it now reads either methamphetamine or cocaine base or a combination of both satisfy the elements of counts 4 + 5." The revised instruction specified with respect to counts four and five that the controlled substance furnished could be "cocaine and/or methamphetamine."

The minutes show that, on June 11, 2009, the court's written response was provided to the jury at 10:05 a.m. and the jury advised it had reached a verdict at 10:11 a.m. The jury found defendant guilty of all five counts.

The court sentenced defendant to a total prison term of 13 years four months on the four felony counts (counts one, three, four and five) and a concurrent one-year county jail term on count two.

## B.  *Evidence*

The victim, J., who was in eighth grade and 14 years old at the time of trial in June 2009, testified that her parents had been separated for about 12 years and she lived with her mother. In 2008, when she was a seventh grader in junior high and 13 years old, her mother thought J. should work on building a relationship with her father, whom she identified as defendant, and J. began to spend more time with him. Over approximately a couple of months ending in July 2008, while J. was 13 years old, she often spent time with defendant. During this period, defendant was at first living in a trailer on someone's driveway, then he was living in hotels, and then he moved to a house in Milpitas.

J. indicated that, before this time period, she had started smoking marijuana with friends. She knew some friends were using cocaine and she was interested in trying some. At the point when her mother was encouraging her to work on a relationship with defendant, she was "interested in experimenting with drugs . . . ."

J. recalled an early incident during this time period when defendant, who was then living in the trailer, allowed her to drink alcohol, a Smirnoff Ice, that she found in his refrigerator. Defendant told her that his father used to let him have drinks. She did not tell her mother.

Defendant provided J. with marijuana, which he had bought. She had seen marijuana before. The first time he gave her marijuana, they were in the trailer. She initially smoked marijuana alone but, after a few times, they smoked together. One time, they ate marijuana. She also smoked marijuana with defendant when he was living in Milpitas. J. got high when she smoked or ingested the marijuana.

J. and defendant drank alcohol together on several different occasions. She recalled a time when she visited defendant in a rented hotel room where he was living and he allowed her to have alcohol, which he had bought. He also offered her Vicodin, which she had seen there. She drank Jägermeister, Red Bulls, and took four Vicodin pills. She ended up vomiting for a long time while defendant stood there. Defendant took pictures of her throwing up and J. later found them on his phone. He then laughed about the pictures, which he thought were funny. When she asked why he took them, he said, " 'Just memories.' " J. told her mother that she had gotten sick but did not tell her mother about the alcohol and pills.

J. continued to spend time with defendant after the hotel incident.

On July 4, 2008, defendant gave J. a substance that he said was cocaine. He was then living in a house in Milpitas. Upstairs in his bedroom, defendant made two lines of cocaine and she snorted one line and he snorted the other. She recalled that it was a "yellowish color." When asked at trial how she knew it was cocaine, J. replied that defendant told her. She also stated, "I'm not sure if what he gave me was cut with something else." J. recalled that she and defendant drank alcohol, specifically Crown Royal, that night. Defendant told J., who was only 13 years old, that alcohol is something good to use with cocaine and advised her to take a couple of shots with a couple of lines. When she went home, J. did not tell her mother what happened.

Defendant and J. made a plan for her to sneak out of her home, meet defendant, and do cocaine for a second time. Defendant drove to J.'s house at night and picked up J., who had snuck out of her house, and drove her to the park. They went to a table in the park, defendant put the cocaine in lines, and they snorted it. Defendant told J. it was cocaine and "it looked like the same powdery substance" to J. They then returned to defendant's truck.

Back in the truck, J. tried to convince defendant to give her the rest of the cocaine. He asked whether she was willing to take pictures and she agreed. He specifically told her that if she wanted the rest of the cocaine, she had to pose for pictures for him.

Defendant and J. went into the bed of the truck and defendant took pictures. He posed her and directed her to lean over. When she said, "But my cleavage shows that way," he replied, "It's okay. Cleavage is beauty. It's an art in photography. It's a beautiful thing." She felt awkward, but she still wanted the cocaine. It did not feel right that defendant was taking pictures of her with her cleavage showing. After about five minutes of picture taking, he gave the cocaine to J. and she brought it home. J. did not tell her mother about using cocaine in the park or about posing for the pictures.

When asked how the cocaine had affected her while she was posing, J. answered, "It wasn't like cocaine. It was more of a wiry drug. So I don't know. But maybe it was meth." She confirmed, however, that defendant had told her it was cocaine. She explained that it did not feel like cocaine "because cocaine makes your face numb and this didn't really make [her] face numb" and "[i]t just gave [her] a lot of energy, racing thoughts."

In July 2008, one or two days after the park incident, J. went to the Milpitas house where defendant lived with others. J. watched defendant as he hosed off his truck and she saw some "red and pink" "gross stuff." When she asked about it, defendant told her the substance was "brains." At first, she believed defendant and was kind of scared and found the remark "a little intimidating." After the truck was washed, they went up to defendant's bedroom. They snorted lines of cocaine together in defendant's closet. She recalled it had a slight pink color. Defendant again told her it was cocaine.

After ingesting the substance, while J. was watching a movie, defendant told J. that she "owed him pictures in [her] underwear." J. thought he was joking. About 10 or 15 minutes later, defendant said something like, "So, you know, anyone else would expect something from giving you all this cocaine." After that statement, she realized defendant was serious. She felt like she was "caught in the middle of a situation."

Defendant took photos with a camera, posing J., who was then still 13 years old, in various positions. She was crying the whole time. He took pictures of J. in her bra and underwear. He allowed her to put on a soccer shirt over her bra. He had her lie down and lift up the soccer shirt. J. felt "[v]ery, very uncomfortable" and it felt like he was taking photos for a "really long" time. At the end of the photo session, defendant showed her a picture of her crying and said that was why he stopped taking pictures.

J. returned home. She did not immediately tell her mother what had happened because, when they started doing coke together, defendant had told her that he would disown her if she ever told anybody about the cocaine. Later that same day, after about five to eight hours had elapsed, J. told her mother about the cocaine and the pictures.

Milpitas Police Officer Minton met J. and her mother when they came to the police department. He received information that defendant had taken photographs of J. Officer Minton and another officer went to the house where defendant was living to investigate and eventually placed him under arrest pursuant to an outstanding warrant. On July 12, 2008, Officer Sanchez assisted Officer Minton with the search of defendant's bedroom. He recovered two USB drives. .

Officer Sanchez gave Officer Minton the two USB or thumb drives, a black one and a green one. Officer Minton viewed the "thumbnail sketches of seven photos" stored on the green USB drive on the computer of one of defendant's housemates. He saw that they were pornographic pictures that looked like J.'s head had been "pasted on them."

At the Milpitas Police Department, defendant was read his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]). Defendant stated he understood and waived those rights. Defendant admitted that he told J. that the dried-up watermelon in his truck that he was washing was human brains, but claimed that he was fooling around. He denied giving her alcohol, marijuana, or cocaine. He claimed that he caught J. drinking a Smirnoff Ice but he had never given her permission to drink it. He conceded that he had offered cocaine in exchange for photographs but he claimed that he never intended to actually give her cocaine. Defendant admitted that he had used methamphetamine before and had been "clean for awhile" but he had been using methamphetamine again for the past couple of months. He said he could not afford to use methamphetamine but used it when his friends had it and estimated that he had used methamphetamine about twice a week during the last two months.

Defendant admitted that he had taken pictures of his daughter posing in her bra and underwear, possibly for as long as 20 minutes, and that he had promised to give her cocaine in exchange for those pictures. He said he would masturbate to the pictures and admitted having "sick thoughts" about his daughter. The pictures of J. in her bra and underwear were not found.

When Officer Minton asked about the photographs on the green USB drive, defendant explained that he had used a Microsoft Paint program to alter pornographic pictures of women he had collected from the Internet by replacing a woman's head with J.'s head. The black thumb drive found in defendant's bedroom held up to about 28 pictures of J., including pictures of her over a toilet. Photographs and enlargements were admitted into evidence.

No defense evidence was presented.

## C. *Sufficiency of the Evidence—Child Pornography*

Section 311.11, subdivision (a), provides: "Every person who knowingly possesses or controls any matter, representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film or filmstrip, the production of which involves the use of a person under the age of 18 years, knowing that the matter *depicts* a person under the age of 18 years *personally* engaging in or simulating sexual conduct, as defined in subdivision (d) of Section 311.4, is guilty of a felony and shall be punished by imprisonment in the state prison, or a county jail for up to one year, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both the fine and imprisonment."[2] (Italics added.) Defendant argues that there is insufficient evidence to support his conviction of possessing child pornography because the photos seized from his computer do not depict J. "personally" engaging in any of the sexual acts prohibited by the statute since she was not the female actually engaging in or simulating the sexual conduct.

---

[2] Section 311.4, subdivision (d)(1), defines "sexual conduct" to mean "any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer, any lewd or lascivious sexual act as defined in Section 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals."

Relying upon the broad meaning of the word "depict," the People argue that the photographs establish that defendant violated section 311.11, subdivision (a), because, as a result of superimposing J.'s head, they "depict, portray and/or represent [his daughter] as being the person engaging in the sexual conduct." The contention is that "the resulting photographs created by appellant exhibit a likeness, or the appearance of [J.] engaging in sexual acts." Defendant responds that this argument renders the word "personally" superfluous, which is contrary to principles of statutory construction. He further asserts that a " 'prohibition against child pornography cannot extend to images that do not depict an actual child without running afoul of the First Amendment.' (*United States v. Wilder* (1st Cir. 2008) 526 F.3d 1, 12 (conc. opn. of Stahl, J.).)" He suggests that the People's interpretation would be unconstitutional under *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234 [152 L.Ed.2d 403, 122 S.Ct. 1389] (hereinafter *Free Speech Coalition*).

■ We are mindful that "[o]ur fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) "Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context. (*People v. Lawrence* (2000) 24 Cal.4th 219, 230 [99 Cal.Rptr.2d 570, 6 P.3d 228].) When statutory language is clear and unambiguous, ' "there is no need for construction and courts should not indulge in it." ' (*People v. Benson* (1998) 18 Cal.4th 24, 30 [74 Cal.Rptr.2d 294, 954 P.2d 557], quoting *People v. Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].)" (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].)

■ In the context of the statute, the word "personally" impliedly means "in person." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 865; see American Heritage Dict. (3d college ed. 1997) p. 1020; The Oxford American Dictionary of Current English, Oxford Reference Online (Oxford University Press 1999) <http://www.oxfordreference.com/views/ENTRY.html?subview= Main&entry=t21.e22723> [as of June 8, 2011].) The word "depict" means "to represent by or as if by a picture" (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 309) or to "represent in a picture or sculpture" (American Heritage Dict. (3d college ed. 1997) p. 373).[3]

---

[3] However, section 311.11, subdivision (d), states: "This section does not apply to drawings, figurines, [and] statues . . . ."

Here, the language of the statute must be deemed ambiguous since it is susceptible of more than one reasonable interpretation. "[I]f the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727].)" (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].) We may also look to principles of statutory construction. (See *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 [48 Cal.Rptr.3d 108, 141 P.3d 225].)

■ "We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' [Citations.]" (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].) In addition, " '[i]t is an established rule of statutory construction that similar statutes should be construed in light of one another [citations], and that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings. [Citations.]' (*People v. Caudillo* (1978) 21 Cal.3d 562, 585 [146 Cal.Rptr. 859, 580 P.2d 274], overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 229, 237, fn. 6 [83 Cal.Rptr.2d 533, 973 P.2d 512].)" (*People v. Lamas* (2007) 42 Cal.4th 516, 525 [67 Cal.Rptr.3d 179, 169 P.3d 102].) "Two ' "[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s or] things, or have the same purpose or object." ' (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4 [253 Cal.Rptr. 1, 763 P.2d 852], quoting 2A Sutherland, Statutory Construction (Sands, 4th ed. 1984) § 51.03, p. 467; see also *Altaville Drug Store, Inc. v. Employment Development Department* (1988) 44 Cal.3d 231, 236, fn. 4 [242 Cal.Rptr. 732, 746 P.2d 871] [in pari materia means ' "[o]f the same matter" ' or ' "on the same subject," ' quoting Black's Law Dict. (5th ed. 1981) p. 1004].)" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1091 [103 Cal.Rptr.3d 767, 222 P.3d 214].)

The phrase "personally engaging in or simulating sexual conduct" or a substantially similar phrase was used in criminal laws related to obscene materials or pornography involving children long before the advent of the Internet or photoediting software. In 1977, subdivision (b) was added to section 311.2. (Stats. 1977, ch. 1061, § 1, pp. 3201–3202.) That subdivision made it a felony for a person to knowingly send or bring into the state for sale or distribution or to possess with intent to distribute or exhibit for commercial consideration obscene matter when the person knows that the obscene matter "depicts a person under the age of 18 years *personally*

*engaging in or personally simulating"* specified sexual acts. (§ 311.2, subd. (b), italics added; Stats. 1977, ch. 1061, § 1, p. 3201, italics added.) The act went into immediate effect as an urgency measure and the Legislature expressly stated that was necessary because "[t]he proliferation of child pornography and the use of minors as subjects in child pornography pose a serious threat to the health and welfare of a large number of minors in California which necessitates immediate address." (Stats. 1977, ch. 1061, § 4, p. 3203.) The legislative history made clear the purpose of that legislation was to prevent exploitation of children used to make child pornography. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1580 (1977–1978 Reg. Sess.) as amended Aug. 18, 1977, p. 1 ["The purpose of the bill is to deter the exploitation of minors in pornography."]; Sen. Democratic Caucus, analysis of Assem. Bill No. 1580 (1977–1978 Reg. Sess.) as amended Sept. 1, 1977, p. 1 ["This bill will deter the exploitation of minors in pornography . . . ."]; Assemblyman Jim Ellis, author of Assem. Bill No. 1580 (1977–1978 Reg. Sess.), letter to Governor Brown, Sept. 8, 1977 ["Enactment of this measure will go a long way toward eliminating the use of children in sexually explicit magazines and films . . . ."].)

In 1985, the California Legislature enacted section 312.3, which established a judicial procedure for the forfeiture and destruction of child pornography. (Former § 312.3, subd. (a), italics added; Stats. 1985, ch. 880, § 1, pp. 2827–2828.) Specifically, forfeiture applied to "[m]atter which depicts a person under the age of 17 years *personally engaging in or personally simulating* sexual conduct as defined in Section 311.4" that was in the possession of a governmental official or agency.[4] (Former § 312.3, subd. (a), italics added; Stats. 1985, ch. 880, § 1, p. 2827, italics added.) The forfeiture provisions did not apply "where the minor depicted is lawfully emancipated, including lawful conduct between spouses where one or more are under the age of 17." (Former § 321.3, subd. (i); Stats. 1985, ch. 880, § 1, pp. 2827, 2828; cf. § 312.3, subd. (i).) This language and the legislative history suggest that the Legislature was targeting matter produced using actual children. (See, e.g., Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 1780 (1985–1986 Reg. Sess.) as amended Aug. 20, 1985 ["Finance has been informed that this bill is in response to the concerns of several parents that obscene matter involving their children was not destroyed after all attempts at prosecution had been exhausted, and no conviction was obtained."].)

---

[4] Section 312.3, subdivision (a), now describes the matter subject to forfeiture and destruction as follows: "Matter that depicts a person under the age of 18 years personally engaging in or personally simulating sexual conduct as defined in Section 311.4 and that is in the possession of any city, county, city and county, or state official or agency is subject to forfeiture pursuant to this section."

In 1985, the Legislature added section 311.10, which made it a crime for a person to advertise for sale or distribute "any obscene matter knowing that it depicts a person under the age of 18 years *personally engaging in or personally simulating* sexual conduct, as defined in Section 311.4 . . . ." (Stats. 1985, ch. 1550, § 1, p. 5709, italics added.) The legislative history indicates that the purpose of the bill was to increase the criminal penalty for advertising child pornography. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2014 (1985–1986 Reg. Sess.) as amended Apr. 29, 1985, pp. 1–2; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Assem. Bill No. 2014 (1985–1986 Reg. Sess.) as amended Aug. 19, 1985, p. 2; Dept. of Corrections, Youth and Adult Correctional Agency, Enrolled Bill Rep. on Assem. Bill No. 2014 (1985–1986 Reg. Sess.) Sept. 23, 1985.) Again, the legislative history indicates that the offender must know that the person depicted is an actual child. (See Dept. of Corrections, Youth and Adult Correctional Agency, analysis of Assem. Bill No. 2014 (1985–1986 Reg. Sess.) as amended Apr. 29, 1985 ["This bill would create a new crime for any person to advertise for sale or distribution any obscene matter <u>and</u> the person knows the obscene matter depicts a minor engaged in or personally simulating specified sexual conduct (the person simulating the conduct may be an adult who has the appearance of a minor)."].)

The legislative history of section 311.11, which was enacted in 1989 (Stats. 1989, ch. 1180, § 2, p. 4568), suggests that the purpose of this law was likewise to protect children from sexual exploitation. An analysis of the bill contained this argument in support of enactment: "According to proponents, child pornography involves the physical, mental, and sexual abuse, seduction, and harmful exploitation of children. They state that it is well documented that collections maintained by pedophiles are used to break down the resistance of children who become victims of sexual abuse. Photos, videos, and other materials, the *production of which requires the use of a child*, are used to solicit, intimidate and control children; these materials are then used to induce other children to engage in sexual activity." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended Sept. 6, 1989, p. 3, italics added; see Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) Sept. 2, 1989, p. 4; Sen. Com. on Judiciary, com. on Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 29, 1989, pp. 2–3; Assem. Third Reading, analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 27, 1989, p. 2; Assem. Third Reading, analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 5, 1989, p. 2; Assem. Ways and Means Com., Republican Analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 5, 1989, p. 1.)

The legislative history of section 311.11 also discloses that the underlying legislative intent was to criminalize possession of child pornography. (See, e.g., Youth and Adult Correctional Agency, Enrolled Bill Rep. on Assem. Bill No. 2233 (1989–1990 Reg. Sess.) prepared for Governor Deukmejian (Sept. 22, 2009) p. 2; Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) Sept. 2, 1989, p. 2; Sen. Com. on Judiciary, com. on Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 29, 1989, p. 2.) One of the arguments in support of the bill was that California had criminalized the production and distribution of child pornography but, unlike 19 other states, this state had not made it unlawful to possess child pornography. (See, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended Sept. 6, 1989, p. 3; Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) Sept. 2, 1989, p. 4; Sen. Com. on Judiciary, com. on Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 29, 1989, p. 2; Assem. Third Reading, analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 27, 1989, p. 2; Assem. Third Reading, analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 5, 1989, p. 2; Assem. Ways and Means Com., Republican Analysis of Assem. Bill No. 2233 (1989–1990 Reg. Sess.) as amended June 5, 1989, p. 1.) In 1989, the term "child pornography" had a particular meaning under *New York v. Ferber* (1982) 458 U.S. 747 [73 L.Ed.2d 1113, 102 S.Ct. 3348] (*Ferber*), which we discuss below.

■ In addition to requiring that the offender have knowledge that "the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct," section 311.11 expressly states that production of the matter must have "involve[d] the use of a person under the age of 18 years . . . ." In light of the legislative history of the section and related crimes concerning obscene materials involving children or child pornography, it would appear that a real child must have been used in production and actually engaged in or simulated the sexual conduct depicted. This conclusion is consistent with the California Supreme Court's statement with regard to section 311.11, albeit in dictum, that "the prohibited matter must depict actual persons, who are actually under 18, engaged in actual or simulated sex acts, and the violator must know that this is so." (*In re Alva* (2004) 33 Cal.4th 254, 262 [14 Cal.Rptr.3d 811, 92 P.3d 311].)

Our conclusion is also buttressed by the "settled axiom of statutory construction that significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be

avoided. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)" (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154].) We agree with defendant that the People's interpretation of section 311.11 renders the word "personally" superfluous.

Any lingering doubts that "personally" requires a real child to have actually engaged in or simulated the sexual conduct depicted are erased by the established rule of statutory construction that "requires us to construe statutes to avoid 'constitutional infirmit[ies].' [Citations.]" (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 846–847 [123 Cal.Rptr.2d 40, 50 P.3d 751].) Under the First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment (*Board of Education v. Pico* (1982) 457 U.S. 853, 856, fn. 1 [73 L.Ed.2d 435, 102 S.Ct. 2799]), "the government may criminalize the possession of child pornography, even though it may not criminalize the mere possession of obscene material involving adults. Compare *Osborne, supra*, at 111, 110 S.Ct. 1691, 109 L.Ed.2d 98, with *Stanley v. Georgia*, 394 U.S. 557, 568, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)." (*United States v. Williams* (2008) 553 U.S. 285, 288–289 [170 L.Ed.2d 650, 128 S.Ct. 1830].) As indicated, the term "child pornography" has a particular meaning under United States Supreme Court decisions.

In *Ferber, supra*, 458 U.S. 747, the United States Supreme Court determined that "[t]he test for child pornography is separate from the obscenity standard enunciated in *Miller*" (*id.* at p. 764) and production and distribution of child pornography is not entitled to First Amendment protection. (*Ferber*, at pp. 764–765.) Thus, under *Ferber*, "pornography showing minors can be proscribed whether or not the images are obscene under the definition set forth in *Miller* v. *California*, 413 U.S. 15 [93 S.Ct. 2607, 37 L.Ed.2d 419] (1973)." (*Free Speech Coalition, supra*, 535 U.S. at p. 240.)

In reaching its holding in *Ferber*, the Supreme Court recognized that "[i]n recent years, the exploitive use of children in the production of pornography has become a serious national problem." (*Ferber, supra*, 458 U.S. at p. 749.) It was aware that "use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child." (*Id.* at p. 758, fn. omitted.) The court declared that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." (*Id.* at p. 757.) It concluded that "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children" because, for one thing, "the materials

produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." (*Id.* at p. 759, fn. omitted.) The court noted: "Sexual molestation by adults is often involved in the production of child sexual performances. [Citation.] When such performances are recorded and distributed, the child's privacy interests are also invaded." (*Id.* at p. 758, fn. 9.) The court observed that "a sexually explicit depiction need not be 'patently offensive' in order to have required the sexual exploitation of a child for its production." (*Id.* at p. 761.)

But the Supreme Court in *Ferber* made clear that there were "limits on the category of child pornography which, like obscenity, is unprotected by the First Amendment." (*Ferber, supra,* 458 U.S. at p. 764.) It stated that "the distribution of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve *live* performance or photographic or other visual reproduction of *live* performances, retains First Amendment protection." (*Id.* at pp. 764–765, italics added.)

Following *Ferber*, in *Osborne v. Ohio* (1990) 495 U.S. 103 [109 L.Ed.2d 98, 110 S.Ct. 1691], the Supreme Court upheld an Ohio law proscribing the possession and viewing of child pornography. Its decision was predicated on the important state interest "in protecting the victims of child pornography" (*id.* at p. 108) and on the state's interest in encouraging the destruction of child pornography so it could not be used by pedophiles to "seduce other children into sexual activity" (*id.* at p. 111, fn. omitted). Thus, although "the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime" (*Stanley v. Georgia* (1969) 394 U.S. 557, 568 [22 L.Ed.2d 542, 89 S.Ct. 1243], fn. omitted), the government may constitutionally criminalize possession of child pornography. (*Osborne v. Ohio, supra,* 495 U.S. at p. 111.)

In *Free Speech Coalition, supra,* 535 U.S. at pages 257–258, the United States Supreme Court struck down provisions of the Child Pornography Prevention Act of 1996 (Pub.L. No. 104-208, div. A, tit. I, § 101(a) (Sept. 30, 1996) 110 Stat. 3009) (CPPA). The CPPA "extend[ed] the federal prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children." (535 U.S. at p. 239.) "The statute prohibit[ed], in specific circumstances, possessing or distributing these images, which may be created by using adults who look like minors or by using computer imaging. The new technology, according to Congress, makes it possible to create realistic images of children who do not exist." (*Id.* at pp. 239–240.)

■ In refusing to extend *Ferber* and *Osborne* to "virtual child pornography," the Supreme Court in *Free Speech Coalition* emphasized that the "CPPA prohibits speech that records no crime and creates no victims by its production." (*Free Speech Coalition, supra*, 535 U.S. at p. 250; see *United States v. Williams, supra*, 553 U.S. at p. 289 [provision held invalid in *Free Speech Coalition* because "the child-protection rationale for speech restriction does not apply to materials produced without children"].) The court emphasized that "*Ferber's* judgment about child pornography was based upon how it was made, not on what it communicated" and *Ferber* "reaffirmed that where the speech is neither obscene nor the product of sexual abuse, it does not fall outside the protection of the First Amendment. [Citation.]" (*Free Speech Coalition*, at pp. 250–251.)

In *Free Speech Coalition*, the Supreme Court found it significant that *Ferber* had "recognized some works in this [child pornography] category might have significant value [citation], but relied on virtual images—the very images prohibited by the CPPA—as an alternative and permissible means of expression: '[I]f it were necessary for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized. Simulation outside of the prohibition of the statute could provide another alternative.' *Id.*, at 763 [102 S.Ct. 3348]." (*Free Speech Coalition, supra*, 535 U.S. at p. 251.) It stressed that "*Ferber*, then, not only referred to the distinction between actual and virtual child pornography, it relied on it as a reason supporting its holding." (*Ibid.*)

The Supreme Court rejected the government's arguments that (1) "CPPA is necessary because pedophiles may use virtual child pornography to seduce children" (*Free Speech Coalition, supra*, 535 U.S. at p. 251), (2) the act's "objective of eliminating the market for pornography produced using real children necessitates a prohibition on virtual images as well" because virtual images are "indistinguishable from real ones" (*id.* at p. 254), and (3) child pornography prosecutions will be very difficult unless both virtual and actual images are prohibited because it will be hard to establish that an image is of an actual child (*ibid.*). The court concluded that none of those arguments justified criminalizing the protected speech of "virtual child pornography" and held that two provisions of the federal CPPA were unconstitutionally overbroad. (535 U.S. at pp. 256–258.)

The Supreme Court made clear that the state's interest in protecting children that justifies restricting free speech is inapplicable to materials produced without children. (*Free Speech Coalition, supra*, 535 U.S. at pp. 250–251, 254.) It explained: "Virtual child pornography is not 'intrinsically related' to the sexual abuse of children, as were the materials in *Ferber*. 458 U.S., at 759 [102 S.Ct. 3348]. While the Government asserts that the

images can lead to actual instances of child abuse, see *infra*, at 251–254, the causal link is contingent and indirect." (*Id.* at p. 250.) It stated that "[i]n the case of the material covered by *Ferber*, the creation of the speech is itself the crime of child abuse . . . ." (*Id.* at p. 254.)

■ In *Free Speech Coalition*, the United States Supreme Court had no occasion to decide whether possession of adult pornography edited by superimposing an actual child's head on an adult body is protected by the First Amendment. In that case, there was "no underlying crime at all" and it did not need to "consider where to strike the balance . . . ." (*Free Speech Coalition, supra*, 535 U.S. at p. 254.) We conclude, however, that the articulated rationales underlying both the *Ferber* and *Free Speech Coalition* decisions compel the conclusion that such altered materials are closer to virtual child pornography than to real child pornography since the use of photoediting software to replace an adult's head with a child's head on pornographic images of the adult does not necessarily involve sexual exploitation of an actual child. Although we may find such altered images morally repugnant, we conclude that mere possession of them remains protected by the First Amendment to the United States Constitution.[5] Therefore, to avoid constitutional infirmity, the term "personally" in section 311.11 must be construed to mean that a real child actually engaged in or simulated the sexual conduct depicted, which is a reasonable interpretation given the legislative history.

■ Accordingly, we conclude that the evidence was insufficient to prove a violation of section 311.11. (See *People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119] [standard of review].) Since uncontroverted evidence established that the sexual images were of adult women and defendant merely superimposed J.'s head on their bodies, a reasonable trier of fact could not find that the images confiscated from defendant depicted J. "personally" engaged in or simulating sexual conduct and, consequently, could not find defendant guilty beyond a reasonable doubt of violating section 311.11.[6]

---

[5] We do not reach the question whether criminal liability may be imposed, consistent with the First and Fourteenth Amendments, upon individuals that knowingly *distribute, publish*, or *exhibit* depictions of sexual conduct produced by computer editing of adult pornographic images using images of a real child where those actions invade the privacy interests of the minor (cf. *Ferber, supra*, 458 U.S. at p. 758, fn. 9 [when a child's sexual performances are "recorded and distributed, the child's privacy interests are also invaded"]) or where the altered material is used to accomplish a sex offense involving a minor.

[6] Since we conclude that the evidence is insufficient to establish a violation of section 311.11, we do not reach defendant's contention that defense counsel's concession of guilt as to possession of child pornography (count one) at closing argument constituted ineffective assistance of counsel (see *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [80 L.Ed.2d

D. *Instructional Error Regarding Health and Safety Code Section 11353*

■ Defendant argues that the trial court's supplemental instruction indicating that Health and Safety Code section 11353 could be violated by providing either cocaine base and/or methamphetamine to a minor constituted reversible error. The People acknowledge that methamphetamine is "not included among the controlled substances specified in section 11353."[7] Nevertheless, the People contend that defendant waived this claim of instructional error by failing to request clarification or amplification of the challenged instruction. They further maintain that the trial court did not erroneously instruct the jury but merely gave an "incomplete" instruction that failed to specify that the offense in counts four and five was either a violation of Health and Safety Code section 11353 or Health and Safety Code section 11380.

The People's argument is that Health and Safety Code section 11380 makes it a crime for an adult to furnish a minor with methamphetamine[8] and "[t]he elements of both section 11353 and 11380 [of the Health and Safety Code] are nearly identical save the nature of the drug itself, and the range of available punishments are the same." They note that the standard instruction given to the jury applies to both Health and Safety Code sections. They assert that defendant's substantial rights were unaffected by the challenged instruction because the omission of the additional code section did not affect his ability to defend and that the amendment of counts four and five was supported by evidence produced at the preliminary hearing.

The People's analysis is flawed. They do not dispute that furnishing cocaine base and furnishing methamphetamine are distinct offenses.

674, 104 S.Ct. 2052]) or his contention that the trial court erred when it omitted the word "personally" from the instruction on the proof required to prove a violation of section 311.11.

[7] Health and Safety Code section 11353 states in pertinent part: "Every person 18 years of age or over, (a) who in any voluntary manner solicits, induces, encourages, or intimidates any minor with the intent that the minor shall violate any provision of this chapter or Section 11550 with respect to either (1) a controlled substance which is specified in . . . paragraph (1) of subdivision (f) of Section 11054 . . . or specified in subdivision (b) . . . of Section 11055 . . . or (c) who unlawfully sells, furnishes, administers, gives, or offers to sell, furnish, administer, or give, any such controlled substance to a minor, shall be punished by imprisonment in the state prison for a period of three, six, or nine years." (See Health & Saf. Code, §§ 11054, subd. (f)(1) ["Cocaine base"], 11055, subd. (b)(6) ["Cocaine, except as specified in Section 11054"].)

[8] Health and Safety Code section 11380, subdivision (a), provides: "Every person 18 years of age or over who violates any provision of this chapter involving controlled substances which are . . . specified in subdivision (d) . . . of Section 11055, . . . who unlawfully furnishes, offers to furnish, or attempts to furnish those controlled substances to a minor shall be punished by imprisonment in the state prison for a period of three, six, or nine years." (See Health & Saf. Code, § 11055, subd. (d)(2) ["Methamphetamine, its salts, isomers, and salts of its isomers"].)

"[S]ections 951 and 952 . . . specify the form and matters that must appear in an information . . . ." (*People v. Schueren* (1973) 10 Cal.3d 553, 558 [111 Cal.Rptr. 129, 516 P.2d 833]; see § 951 [specifying form of indictment or information].) Section 952 provides: "In charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. . . ." "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under *separate counts* . . . ."[9] (§ 954, italics added.)

"[I]t is clear that a valid accusatory pleading need not specify by number the statute under which the accused is being charged. (*People* v. *Schueren*[, *supra*,] 10 Cal.3d 553, 558 . . . ; People v. *Deas* (1972) 27 Cal.App.3d 860, 863 [104 Cal.Rptr. 250].)" (*People v. Thomas* (1987) 43 Cal.3d 818, 826 [239 Cal.Rptr. 307, 740 P.2d 419].) "[E]ven a reference to the wrong statute has been viewed of no consequence . . . [citations]." (*People v. Schueren, supra,* 10 Cal.3d at p. 558.) But this is not a case where the charging language merely designated the wrong code section for the offense described. (Cf. *People v. Rivers* (1961) 188 Cal.App.2d 189, 195 [10 Cal.Rptr. 309] [the language of the information "plainly informed [the defendant] of the nature of his offense, and the designation of the wrong code section [was] immaterial"]; see § 960 ["No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."].)

When the offense charged in a particular count is uncertain, "reasonable doubts in determining the identity of the offense charged are to be resolved in the defendant's favor. [Citations.]" (*People v. Schueren, supra,* 10 Cal.3d at p. 558.) In *Schueren*, there was an issue whether defendant had been charged with assault with intent to commit murder or assault with a deadly weapon. (*Id.* at p. 557.) In a single count, the prosecutor had "charged the elements of two kinds of aggravated assaults defined by two separate sections of the Penal Code, assault with intent to commit murder (Pen. Code, § 217) and assault with a deadly weapon (Pen. Code, § 245, subd. (a))" but "[t]he pleading alleged that the act violated section 217 and made no reference to section 245." (*Id.* at p. 558.) "The Attorney General argue[d] that the 'charge stated no single offense . . . but instead it stated a compound allegation of two offenses . . . .' " (*Id.* at p. 557.) After observing that sections 951 and 952 govern the form and content of an information, the Supreme

---

[9] The jury was instructed: "[E]ach of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one."

Court concluded: "In the instant case resolving reasonable doubts in defendant's favor, it is clear that the crime charged is assault with intent to commit murder." (10 Cal.3d at p. 558, fn. omitted.)

In this case, counts four and five in the original information and in the first amended information specified that the controlled substance was cocaine base and the crimes were violations of Health and Safety Code section 11353. Counts four and five of the first amended information as amended after submission to the jury, to provide that the controlled substance was cocaine base and/or methamphetamine, still refer to only Health and Safety Code section 11353 and make no mention of Health and Safety Code section 11380. The fact that the standard form instruction (CALCRIM No. 2380) parenthetically indicated that the instruction could be used for several offenses, including Health and Safety Code section 11380, is inconsequential. The pattern instruction provides a blank space for insertion of the appropriate code section and the trial court's oral and written jury instruction specified that defendant was charged with violating Health and Safety Code section 11353 in counts four and five. With respect to those counts, the jury found defendant guilty of violating Health and Safety Code section 11353 and the judgment of conviction so reflects. We roundly reject the People's argument that counts four and five charged defendant with a violation of Health and Safety Code section 11380.

Further, an amendment of the accusatory pleading to charge a violation of Health and Safety Code section 11380 as to the third furnishing incident would certainly have run afoul of section 1009. At the preliminary hearing, the victim testified that defendant was a "crystal meth addict" but she also stated that she had never seen defendant "do methamphetamine." While she indicated at the preliminary hearing that she personally believed that the cocaine she snorted with defendant on the first occasion had been "cut with meth" because she had heard that cocaine makes your mouth numb and her mouth did not become numb and she became "really wired," she did not mention anything about methamphetamine in regard to the second and third occasions on which she snorted cocaine with defendant. "[A]n information [cannot be amended] so as to charge an offense not shown by the evidence taken at the preliminary examination."[10] (§ 1009; see Cal. Const., art. I, § 14 ["Felonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information."].)

---

[10] "Section 1009 preserves a defendant's substantial right to trial on a charge of which he had due notice. (*People* v. *Flowers* (1971) 14 Cal.App.3d 1017, 1020–1021 [92 Cal.Rptr. 647].)" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 903–904 [273 Cal.Rptr. 757].) "A defendant may be convicted of an uncharged crime if, but only if, the uncharged crime is necessarily included in the charged crime. (§ 1159; *People v. Lohbauer* (1981) 29 Cal.3d 364, 368–369 [173 Cal.Rptr. 453, 627 P.2d 183].)" (*People v. Reed* (2006) 38 Cal.4th 1224, 1227 [45 Cal.Rptr.3d 353, 137 P.3d 184].)

Defendant did not forfeit his claim of instructional error on the elements of a violation of Health and Safety Code section 11353. It is well settled that "[t]he trial court must instruct even without request on the general principles of law relevant to and governing the case. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1].) "That obligation includes instructions on all of the elements of a charged offense. (*People* v. *Dyer* (1988) 45 Cal.3d 26, 60 [246 Cal.Rptr. 209, 753 P.2d 1].)" (*Ibid.*) We may review his claim of instructional error even in the absence of any objection below. (§ 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)

Here, the court's supplemental instruction allowed each juror to conclude the controlled substance element of counts four and five had been proven if defendant furnished either cocaine base or methamphetamine. Thus, the instruction presented the jury with a legally incorrect theory on which to convict defendant of violating Health and Safety Code section 11353.

In *Griffin v. United States* (1991) 502 U.S. 46, 49 [116 L.Ed.2d 371, 112 S.Ct. 466], the United States Supreme Court "drew a distinction between a mistake about the law, which is subject to the rule generally requiring reversal, and a mistake concerning the weight or the factual import of the evidence, which does not require reversal when another valid basis for conviction exists." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1125 [17 Cal.Rptr.2d 365, 847 P.2d 45].) The United States Supreme Court stated: "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." (*Griffin v. United States, supra,* 502 U.S. at p. 59 [rejecting contention that a general verdict should be set aside when one of the possible factual bases of conviction was unsupported by sufficient evidence].)

The California Supreme Court has similarly explained: "When one of the theories presented to a jury is legally inadequate, such as a theory which ' "fails to come within the statutory definition of the crime" ' (*People v. Guiton, supra,* 4 Cal.4th at p. 1128, quoting *Griffin v. United States*[, *supra,*] 502 U.S. 46, 59 . . .), the jury cannot reasonably be expected to divine its

legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' (*Guiton*, at p. 1130.)" (*People v. Perez* (2005) 35 Cal.4th 1219, 1233 [29 Cal.Rptr.3d 423, 113 P.3d 100].)

"A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one. See *Stromberg* v. *California*, 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117] (1931); *Yates* v. *United States*, 354 U.S. 298 [77 S.Ct. 1064, 1 L.Ed.2d 1356] (1957)." (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 58 [172 L.Ed.2d 388, 129 S.Ct. 530] (*per curiam*).) But such error is not structural and is subject to harmless-error review under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Hedgpeth v. Pulido, supra*, 555 U.S. at pp. 58–62 [129 S.Ct. at pp. 530–532]; see *Skilling v. United States* (2010) 561 U.S. ___, ___ [177 L.Ed.2d 619, 130 S.Ct. 2896, 2934].)

In this case, it appeared from the jury communication that one or more jurors had a doubt whether the substance provided to J. and identified as cocaine by defendant was in fact cocaine since defendant had admitted to regularly using methamphetamine in the recent past and J. testified at trial that she may have been given methamphetamine instead of cocaine on the occasion in the park. The timing of the jury's verdicts, returned within mere minutes of receiving the supplemental instruction, suggests that, in finding defendant guilty of counts four and five, one or more of the jurors may have relied on the invalid legal theory and merely found that the controlled substance was at least one or the other of the two controlled substances instead of finding beyond a reasonable doubt that defendant furnished cocaine base to J. Under these circumstances, we cannot find the instructional error on counts four and five harmless beyond a reasonable doubt.

E.  *No-contact Order*

At sentencing, the trial court ordered defendant to have no contact with the victim or her family. Defendant argues that the order is invalid because it was not authorized by section 1202.05 or any other statute. Defendant was not convicted of any of the sex offenses enumerated by section 1202.05, which presently authorizes courts to prohibit visitation between a defendant sentenced to state prison and the child victim. The People concede error and ask this court to strike the order. We agree this is the appropriate remedy.

## DISPOSITION

The judgment is reversed as to counts one, four, and five. The no-contact order is stricken. The cause is remanded for possible retrial on counts four and five. The trial court shall resentence defendant on the remaining counts unless the prosecutor elects to retry counts four and five.

Mihara, J., and Grover, J.,[*] concurred.

[*]Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.